**B.P.G. AUTOLAND JEEP–EAGLE, INC. d/b/a BPG Autoland, et al., Plaintiffs,**

v.

**CHRYSLER CREDIT CORPORATION, Defendant.**

Civ. A. No. 91–12265.

United States District Court, D. Massachusetts.

Nov. 26, 1991.

*mond,* 110 S.Ct. at 2474–75.

MEMORANDUM OF DECISION AND ORDER REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

DAVID S. NELSON, District Judge.

I. *Background.*

Plaintiffs B.P.G. Autoland Jeep–Eagle Inc. (hereinafter, "B.P.G."), Lawrence and Arlene Bellerose, Brian and Ulrika Gates, and Providence Pike Realty Corporation have filed a complaint with this court alleging defendant's breach of contract, breach of fiduciary duty and duty of good faith and fair dealing, and violations of Massachusetts General Laws, Chapter 93A and Connecticut General Statutes, 42–110a to 42–110q, 42–133e, and 42–133r to 42–133ee. This case was originally filed in Bristol Superior Court in the Commonwealth of Massachusetts. Defendant removed this case to federal court pursuant to 28 U.S.C.A. § 1446 (West 1973 & Supp.1991), based on diversity of citizenship. Defendant has filed counterclaims against B.P.G. alleging violations of its security agreement and promissory note and against Lawrence and Arlene Bellerose and Brian and Ulrika Gates based on their guaranties of B.P.G.'s obligations and liabilities.

Plaintiffs filed a motion for a temporary restraining order that was allowed on September 17, 1991 (Docket No. 7), this temporary order was modified by a subsequent Order of this court issued on September 23, 1991 (Docket No. 16). Plaintiffs have filed a motion for injunctive relief entitled, *Plaintiffs' Motion for Preliminary Injunction Against Chrysler Credit Corporation* (Docket No. 3), by which it seeks a preliminary injunction pursuant to Fed. R.Civ.P. 65(a), and a further motion entitled, *Plaintiff's Motion for Ex–Parte Injunctive Relief* (Docket No. 34). At a conference before the court on September 23, 1991, the parties agreed to forgo oral argument and to have the motion decided on submitted memoranda and supporting documents.

II. *Statement of Facts.*

A. The Parties.

Plaintiffs Lawrence Bellerose (hereinafter, "Bellerose"), Brian P. Gates (hereinafter, "Gates"), and Robert DeRita (not a party to this suit) (hereinafter, "DeRita") are shareholders of the B.P.G. automobile dealership, located at 135 Providence Pike, Putnam, Connecticut. They hold 37.5%, 37.5%, and 25% of the shares in B.P.G.,

respectively. Arlene Bellerose is the wife of Lawrence Bellerose, and Ulrika Gates is the wife of Brian Gates. All individual plaintiffs reside in Putnam, Connecticut. In addition, Bellerose and Gates are sole shareholders in Providence Pike Realty Corporation (hereinafter, "PPRC"), which is the owner and lessor of the building and real property serving as the place of business for its tenant, B.P.G.

Chrysler Credit Corporation (hereinafter, "CCC") is affiliated with Chrysler Motors Corporation (hereinafter, "CMC"), is incorporated under the laws of the State of Delaware, and has a usual place of business in Southfield, Michigan. CCC provides automobile loans to consumers and credit and financial services to automobile dealers. CCC has an office in Seekonk, Massachusetts, with which plaintiffs in this action have primarily dealt.

## B. Relationship of B.P.G. and CCC.

### 1. *The Franchise.*

On September 29, 1989, B.P.G. Autoland Jeep–Eagle Dealership consummated its existence as a Chrysler franchise with the following series of documents.

a. *Sales and Service Agreements.* B.P.G. undertook two American Motors Sales Corporation Sales and Service Agreements (hereinafter, "Sales and Service Agreements") with American Motors Sales Corporation, identical except that one refers to Jeep products and service and the other to Eagle (Complaint, Docket No. 3, Exhibit 1). The stated end of the agreement is as follows: "The purpose of the relationship established by this Agreement is to provide a means for the sale and service of specified [Eagle, Jeep] vehicles and the sale of AMSC vehicle parts and accessories in a manner that will maximize customer satisfaction and be of benefit to Dealer and AMSC."

Referenced in and appended to these Sales and Service Agreements is a document entitled, American Motors Sales Corporation Sales and Service Agreement Additional Terms and Provisions. Contained within this document is a provision headed "(e) FINANCES," which states,

DEALER shall maintain and employ in connection with DEALER'S business such net working capital, net worth, and wholesale credit and retail financing arrangements necessary for DEALER to carry out successfully DEALER'S undertakings pursuant to this Agreement and in accordance with guides therefor as may be issued by AMSC from time to time. At no time shall DEALER'S net working capital be less than the amount specified in the Minimum Working Capital Agreement executed in conjunction with this Agreement and incorporated herein by reference, or the amount thereafter established by any superseding Minimum Working Capital Agreement.

Both Sales and Service Agreements were signed on behalf of B.P.G. by Brian Gates, who is listed as President and Treasurer of B.P.G. in the agreement. CCC is not a party or signatory on either agreement.

b. *Minimum Working Capital Agreement.* Also signed on September 29, 1989 was a "Minimum Working Capital Agreement DAP–10J" between B.P.G. and Jeep Eagle Sales Corporation (hereinafter, "JESC"). That agreement proclaims, by agreement of the Dealer and JESC, that $162,948 was necessary at a minimum to "carry out said Dealer's undertakings." The agreement further stated that "Dealer now has actual Net Working Capital of $204,586." Again, CCC is not referenced nor a signatory to this document.

### 2. *Financing.*

a. *Security Agreement and Master Credit Agreement.* On October 5, 1989, B.P.G. and CCC executed a Security Agreement and Master Credit Agreement and an Amendment to the Security Agreement and Master Credit Agreement (hereinafter, collectively referred to as "Security Agree-

ment"), which essentially provided B.P.G. with a revolving line of credit to purchase vehicles from the manufacturer. By the terms of this agreement, CCC was to provide B.P.G. wholesale financing for "new and unused vehicles sold and distributed by American Motors Sales Corp." This financing was to be provided by CCC in the form of loans or advances to B.P.G. in return for a security interest in the vehicles financed per the Agreement and all other assets of B.P.G.'s business. B.P.G. in return agreed to "promptly remit to Secured Party [CCC] the total amount then outstanding of Secured Party's Advance on each such Vehicle." Security Agreement, ¶ 2.1. This financing arrangement between B.P.G. and CCC is known in the parlance of the business as a "floorplan financing agreement" or "floorplan."

The Security Agreement then lists situations constituting "Events of Default,"[1] which allow CCC to "take immediate possession of said Vehicles without demand or further notice and without legal process." Other provisions of the Security Agreement require B.P.G. to submit monthly financial information to CCC.

b. *Other Ancillary Documents.* In addition to the Security Agreement, on October 5, 1989, Gates executed a promissory note on behalf of B.P.G. and in favor of CCC for a total of $1.5 million dollars; a document entitled Assignment of Factory Credits by which B.P.G. authorized CCC to receive monies due to B.P.G. from CMC; a Dealer Cash Management Agreement; Power of Attorney and Signatory Authorization; and, Dealer Payment Authorization, by which B.P.G. authorized CMC to accept payment from CCC for B.P.G.'s orders. Finally, Arlene and Lawrence Bellerose and Ulrika and Brian Gates executed personal guaranties for B.P.G.'s debt to CCC on documents entitled "Continuing Guaranty."

On April 27, 1990, B.P.G. and CCC entered into a separate security agreement by which CCC financed $31,814.18 worth of equipment for B.P.G. *See* "Security Agreement Dealer Equipment."

c. *Non–CCC Financing.* According to the Verified Complaint (Docket No. 3), PPRC obtained a $550,000 construction loan from Citizen's National Bank of Putnam in exchange for a first mortgage on B.P.G.'s dealership premises, and a second loan was executed for $50,000 in exchange for a second mortgage.

3. *B.P.G.'s Operational History.*

a. *The Out–of–Trust Condition.* From very nearly the outset of its existence, B.P.G. met with unforeseen difficulties that severely hampered its cash flow. By late October of 1989, the dealership was faced with a $100,000 cost overage in the construction of the dealership. In addition, B.P.G. was required to purchase an inventory of parts and tools totalling $70,000. Beyond these capital costs, because of the nature of the arrangement with the automobile manufacturer (CMC), B.P.G.'s realization of profits was at least partially delayed until receipt of manufacturer's incentive monies, which were not dispersed until after vehicles were sold. B.P.G. was in a sense a victim of its own success. It initially sold many more automobiles than projected, which required it to self-finance trade-in vehicles not manufactured by Chrysler, and to wait for manufacturer incentives. These realities, coupled with the above unforeseen costs, left B.P.G. with a scarcity of working capital within a short time of its opening.

By January of 1990, B.P.G. was unable to repay CCC the amount it had financed as vehicles were sold, which constituted a vio-

---

**1.** It appears from the copies of the Security Agreement provided by both parties that a page is missing, which apparently lists further events of default. However, as the parties agree that B.P.G. was in default by the terms of the Security Agreement, the omitted page is not crucial at this juncture.

lation of the Security Agreement. Because the dealership holds the amount advanced by CCC (usually the wholesale cost of the automobile) in trust after the sale of a vehicle, failure of the dealer to remit this amount to CCC promptly results in the dealer being "out of trust" and the vehicles are said to be "sold out of trust" (hereinafter, "SOT"). This out-of-trust condition was an Event of Default under the Security Agreement.

Gates claims to have informed Manuel Silva, an employee of CCC, about B.P.G.'s SOT condition in January. Defendant admits to being aware of B.P.G.'s out-of-trust condition "for several months prior to February, 1990." Affidavit of Robert Rencurrel (Branch Manager of CCC's Seekonk, Massachusetts, Office), Docket No. 21, ¶ 7 (hereinafter, "Rencurrel Affidavit"). However, it was not until July 27, 1990 that CCC did a formal accounting of the B.P.G.'s books and spoke with Gates about the problem. Rencurrel Affidavit, ¶¶ 7, 8. CCC took no action in response to the SOT amount through December, 1990. Rencurrel Affidavit, ¶ 9. (Although, it appears that from some period in November, 1990 to January, 1991, B.P.G.'s privileges to purchase Chrysler "executive cars" were suspended by CCC. Gates Affidavit, Docket No. 3, ¶ 36).

Apparently in January or February of 1991, CCC did file an assignment of factory credits with CMC, by which CCC received all monies owed to B.P.G. by CMC. Rencurrel Affidavit, ¶ 10. These monies were released by CCC to B.P.G. on February 11, 1991. *Id.* at ¶ 12. In January of 1991, Bellerose, a shareholder of B.P.G., pledged security for the out-of-trust amount. *Id.*

In addition to the above, CCC generated a series of letters to B.P.G. in 1991 notifying B.P.G. that, if B.P.G. did not receive an infusion of working capital of $425,000, B.P.G.'s line of credit with CCC would be canceled. The initial deadline for this infusion of capital was February 7, 1991. Rencurrel Affidavit, Exhibit 4. This deadline was apparently extended verbally until April 30, 1991. *Id.* at ¶ 12. A second letter dated July 24, 1991, indicates the same ultimatum, but imposes a deadline of August 23, 1991. *Id.* at Exhibit 6. On August 15, 1991, CCC cut-off B.P.G.'s line of credit. Gates Affidavit, ¶ 60.

b. *Capital Loan from CCC.* Apparently, at many times throughout their relationship, B.P.G. and CCC discussed CCC's making a capital loan to B.P.G. to bolster its waning working capital. In fact, Gates recounts that his initial discussion with CCC, through Roger Pigneault, took place on B.P.G.'s opening day, after Gates discovered the construction cost overruns. Gates Affidavit, ¶ 8. The plan, it seems, was for CCC to take over the first and second mortgages on B.P.G.'s premises and lend an additional amount on the newly assessed increase in value on the property. *Id.* at ¶¶ 8, 9.

Gates recounts that he provided CCC with an updated appraisal of B.P.G.'s property in November of 1989 and until July of 1990, when he was told by CCC that it would not provide a loan to B.P.G., Gates was under the impression that a loan was forthcoming from CCC. Gates Affidavit, ¶¶ 9, 14–17, 22–27. In the interim, Gates passed up an opportunity to seek additional financing from Citizen's National Bank of Putnam, the bank that provided a mortgage on B.P.G.'s premises originally. *Id.* at ¶¶ 15–16.

On July 6, 1990, CCC's Seekonk Office, through its Branch Manager Robert Rencurrel, made a capital loan request on behalf of B.P.G. to the Eastern Area Office. Rencurrel Affidavit, Exhibit 7. Within this application, under the heading, "Financial Information," Rencurrel acknowledges that the purpose of the loan was to provide much needed working capital. The Branch Office recommended approval of the loan. In response, on July 16, the Eastern Area Office stated, "[i]t appears Chrysler Credit would not want to take out first and second mortgages in order to recapitalize dealer-

ship. Rather principals should be required to make a subordinated investment, and Chrysler Credit would entertain a capital loan, provided it did not exceed our standard lending ratios." *Id.* at Exhibit 8.

Again the subject of a CCC capital loan arose in November, 1990. An attorney for CCC wrote to B.P.G.'s attorney on November 1, 1990, requesting an environmental site assessment in conjunction with a loan from CCC on the B.P.G. property. In addition, the attorney requested several additional documents in anticipation of a closing. Plaintiff's Motion for Preliminary Injunction Against Chrysler Credit Corporation, Exhibit 3.

Beginning in August of 1990, CCC began to issue "Dealer Trouble Flashes" twice monthly in which it assessed the financial condition of B.P.G. and provided regular notations. Beginning with the flash of 9/5/91 and ending on 1/2/91, the reports consistently mention B.P.G.'s pursuit of a mortgage, many times specifically attributing the source as CCC. Rencurrel Affidavit, Exhibit 3. Again a possible capital loan from CCC is mentioned on the 7/1/91 flash. *Id.*

To date, CCC has not issued a capital loan to B.P.G. Mr. Rencurrel admits that he had many discussions concerning a capital loan from CCC to B.P.G. He also states that the Branch Office has no authority to loan money or commit CCC to making loans. *Id.* However, he does not confirm that he conveyed his lack of authority to B.P.G. at any time.

## III. *Legal Analysis.*

### A. Standards for Preliminary Injunctive Relief.

■ Preliminary injunction "is an injunction that is issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2947, p. 423 (1973 & Supp. 1991).

In evaluating a motion for preliminary injunction, the First Circuit has long-standing parameters.

In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979).

### 1. *Likelihood of Success on the Merits.*

■ Of all four above prongs of the test for injunctive relief, the most critical is plaintiff's likelihood of success on the merits of its case. *Lancor v. Lebanon Hous. Auth.,* 760 F.2d 361, 362 (1st Cir.1985); *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). However, a no-lose situation for plaintiff is not a prerequisite for injunctive relief. "[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of *probable* outcomes." *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6 (1st Cir.1991) (emphasis added).

■ In addition, plaintiff's burden of demonstrating its likelihood of success fluctuates with the corresponding harm to defendant of issuing the injunction—the greater the harm, the heavier plaintiff's burden to show success. *A–Copy, Inc. v. Michaelson,* 599 F.2d 450, 451 (1st Cir. 1978).

a. *Breach of a Covenant of Good Faith and Fair Dealing.*[2,3] "The implied covenant of good faith and fair dealing has been applied by this court in a variety of contractual relationships ... 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party ...'" *Magnan v. Anaconda Indus., Inc.,* 193 Conn. 558, 566, 479 A.2d 781 (1984) (citing, 2 Restatement (Second) of Contracts § 205, comment a (1979)). "A breach of an implied contractual covenant of good faith and fair dealing gives rise to a distinct tort claim." *Economic Development Assoc. v. Cititrust,* No. 052665, 1991 WL 50316, at *1, 1991 Conn.Super. LEXIS 653, at *5 (Conn.Super.Ct. March 27, 1991). Further, "[i]n a case of first impression, a Connecticut court has allowed a claim for breach of an implied covenant of good faith and fair dealing in the context of a lender-borrower relationship." *Id.* (citing *Sorvillo v. Strother,* 2 CSCR 1095 (October 1, 1987, Leuba, J.)); *Lafayette Bank & Trust Co. v. Jarvis,* No. CV90 0272005S, 1991 WL 205112, at *3, 1991 Conn.Super. LEXIS 2243, at *9 (Conn.Super.Ct. September 24, 1991).

Despite the mechanical provisions of an agreement, the actual historical relationship between a borrower and lender may alter a lender's obligations when it attempts to enforce those provisions at a later time. "[W]hen the lender initially displays leniency toward the borrower in its administration of the loan agreement, it may later violate the good faith obligation if it suddenly changes its previously lenient course of dealing." K.J. Goldberg, *Lender Liability and Good Faith,* 68 B.U.L.Rev. 653, 659 (1988); *Alaska Statebank v. Fairco,* 674 P.2d 288, 292 (Alaska 1983).

[A] secured party who has not insisted upon strict compliance in the past, who has accepted late payments as a matter of course, *must,* before he may validly rely upon such a clause to declare a default and effect repossession, *give notice* to the debtor (lessee) that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided.

*Id.,* at 292–93 (citing *Nevada National Bank v. Huff,* 94 Nev. 506, 582 P.2d 364, 369 (1978)).

An implied covenant of good faith and fair dealing arising out of lender's course of conduct has been interpreted beyond requiring notice to borrower before repossessing collateral and has been applied to situations where, as here, lender has cut-off borrower's line of credit. *K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 759 (6th Cir.1985).

As recounted above, for over a year and a half, CCC's course of dealing with B.P.G.'s out-of-trust condition could reasonably have conveyed to B.P.G. that CCC would tolerate, although not forgive, the additional debt. B.P.G.'s line of credit was never cut off, even when it's out-of-trust condition reached a high of $391,000 in February of 1991. Rencurrel Affidavit, ¶ 10. When the line of credit was modified, as happened when CCC refused to allow B.P.G. to buy cars at Chrysler's auction or

---

**2.** *Choice of Law.* The Security Agreement between CCC and B.P.G. contains the following provision: "This Agreement shall be interpreted according to the laws of the State of the Debtor's principle place of business as identified above." B.P.G.'s principal place of business is listed as Putnam, Connecticut.

"In diversity cases, federal courts must apply the choice of law rules of the state in which the court sits." *Brennan v. Carvel Corp.,* 929 F.2d 801, 806 (1st Cir.1991) (citing, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941)). "Massachusetts courts ordinarily uphold such [choice of law] clauses so long as there is no serious conflict with public policy." *Wellons v. Numerica Sav. Bank, F.S.B.,* 749 F.Supp. 336,

337 n. 3 (D.Mass.1990); *Ernest and Norman Hart Brothers, Inc. v. Town Contractors, Inc.,* 18 Mass.App.Ct. 60, 65 n. 3, 463 N.E.2d 355 (1984) ("Counsel should be aware that the Supreme Judicial Court has recognized the validity of contractual provisions ... (b) for reasonable selection of law to govern a transaction.")

For this action, as no public policy objections have been raised, the law of Connecticut will govern with respect to those counts arising from an alleged covenant of good faith and fair dealing implied within the Security Agreement.

**3.** As plaintiff has predominantly argued and relied upon this count of its complaint, this court will do the same.

CCC held factory credits due B.P.G., the modification was removed within a short time.

In like fashion, although CCC arguably issued a letter of notice with regard to a cut-off of B.P.G.'s floorplan finance plan on July 24, 1991, it had several flaws. First, the July 24 Letter required B.P.G. to infuse $425,000 by August 23, 1991 "in order to maintain existing credit lines." However, as is recounted by Brian Gates, the line of credit was actually terminated on or before August 15, 1991, a week before the date established in the letter. Gates was notified of the cut-off when he attempted to place orders for new cars with CMC on that date. His order for new cars was denied.

Second, although CCC maintains in its July 24 letter that it "requires the additional investment for the reason that wholesale audits have disclosed that vehicles have been sold without payment of the lien payment due to Chrysler Credit ("Sold Out of Trust")," what they actually required of B.P.G. was an additional investment of working capital into B.P.G., rather than repayment of the out-of-trust amount. However, the minimum working capital agreement for the B.P.G. franchise was with CMC, not CCC. CCC was arguably without authority to cut off B.P.G.'s financing for B.P.G.'s failure to replenish working capital.

Finally, the July 24, 1991 Letter was a reiteration of a letter sent to B.P.G. on January 8, 1991, which required B.P.G. to invest $425,000 in the business by February 7, 1991 or lose financing through CCC. This deadline was extended by CCC several times, ostensibly on the understanding that something could be worked out, which often included the possibility of a capital loan from CCC.

In total, CCC's course of dealing over the period of its relationship with B.P.G. made the cut-off of B.P.G.'s floorplan finance arrangement on August 15, 1991, and the withholding of its factory credits acts of bad faith. Throughout B.P.G.'s existence, CCC demonstrated consistent leniency with B.P.G.'s SOT, to the point that B.P.G. could

reasonably have considered CCC's demand letters negotiable, if not perfunctory. In fact, Gates relates that Rencurrel offered to extend the August 23, 1991 deadline for the $425,000 investment, if B.P.G.'s principals could make a smaller interim financial commitment. In addition, at the time floorplan financing was cut-off, B.P.G.'s SOT debt had been substantially reduced from its February, 1991 high. Therefore, for financing to be abruptly denied, 8 days short of the deadline proposed in CCC's "demand letter," constitutes a breach of the covenant of good faith and fair dealing implied in the financial agreements between B.P.G. and CCC.

*2. Irreparable Injury.*

In addition to establishing its chance of success on the merits, B.P.G. must convince this court that, in the absence of a preliminary injunction, it will suffer injury that cannot be compensated in dollar damages. B.P.G. seeks injunctive relief in order to reestablish its floorplan financing— the line of credit vital to its acquisition of inventory. Without this financial lifeline, B.P.G. will not be able to replenish its stock of automobiles, and will ultimately cease as a going concern.

> Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable. Indeed, when the potential economic loss is so great as to threaten the existence of the moving party's business, then an injunction may be granted, even though the amount of direct financial harm is readily ascertainable.

Wright & Miller, *supra* § 2948, p. 439. *See Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970) (citing *Bateman v. Ford Motor Co.,* 302 F.2d 63, 66 (3d Cir.1962)) ("a 'judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a ... franchise.' ").

Because failure to reinstate B.P.G.'s line of credit will almost surely result in its failure to function as a franchise, this court finds that B.P.G. has sufficiently demonstrated the requisite irreparable injury to justify injunctive relief.

### 3. *Balancing the Equities.*

On this prong, the balance tips decidedly toward B.P.G. As stated in the foregoing section, B.P.G. stands to lose its status as a going concern. Conversely, CCC is fully collateralized for the outstanding indebtedness. It has security interests in all of B.P.G.'s inventory and assets, as well as personal guaranties from the principal shareholders and their spouses. Further, Bellerose has posted additional collateral to cover the SOT amount. B.P.G. has paid interest on the outstanding indebtedness, as well.

Therefore, as CCC is fully secured and has carried B.P.G.'s out-of-trust indebtedness for over a year and a half, which at times comprised almost twice the present figure, and that by reopening B.P.G.'s floorplan CCC will quite possibly allow B.P.G. to further reduce its SOT indebtedness through the continued sale of automobiles, this court finds that the harm created by requiring CCC to reinstitute B.P.G.'s floorplan minimal compared to the harm to be suffered by B.P.G. by failing to do so.

### 4. *Equitable Defense of Unclean Hands.*

■ Defendant claims that plaintiff cannot avail itself of equitable relief because it has not done equity itself. Defendant argues that B.P.G., by somehow obscuring its out-of-trust condition in its bookkeeping, has forfeited its right to apply to this court for preliminary injunction. Based on the facts presented, this court disagrees with defendant's assessment.

Mr. Rencurrel, Branch Manager for CCC, admits that CCC was aware of B.P.G.'s SOT condition since at least late 1989. Mr. Gates claims to have kept CCC apprised of its working capital and out-of-trust dilemma at all times. In addition, defendant provides little more than allegations that B.P.G. purposely secreted its SOT condition. Finally, even if this court accepted that B.P.G. purposely obfuscated its financial state, which it does not from the evidence presented, "[t]he unclean hands defense is not an automatic or absolute bar to relief." Wright & Miller, *supra* § 2946. This court does not find evidence of bad faith by plaintiff sufficient to prohibit B.P.G.'s pursuit of equitable relief.

### IV. *Conclusion.*

For the foregoing reasons, preliminary injunctive relief is allowed as follows:

1) Chrysler Credit Corporation shall reinstate B.P.G.'s floorplan financing agreement and forward to it all factory credits earned by B.P.G.,

2) B.P.G.'s out-of-trust condition shall not exceed the present amount,

3) B.P.G. shall continue to pay interest to CCC on its indebtedness including the out-of-trust amount,

4) B.P.G. shall continue to collateralize its indebtedness to CCC in full.

SO ORDERED.