**Costa H. PIANTES, Plaintiff,**

v.

**PEPPERIDGE FARM, INCORPORATED, Defendant.**

**Civ. A. No. 93–10167NG.**

United States District Court, D. Massachusetts.

Feb. 1, 1995.

George W. Mykulak, Goldstein & Manello, Boston, MA, for plaintiff Costa H. Piantes.

Harrison A. Fitch, Fitch & Tourse, PC, Boston, MA, for defendant Pepperidge Farm, Inc.

## CORRECTED MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

Plaintiff Costa H. Piantes ("Piantes") brought this action against defendant Pepperidge Farm, Inc. ("PFI"), seeking declaratory and injunctive relief in connection with PFI's unilateral termination of Piantes' distributorship franchise. Piantes also seeks damages under M.G.L. ch. 93A.

Before me is PFI's motion for summary judgment. Also before me is Piantes' motion for leave to amend the complaint to add an additional claim for breach of an implied covenant of good faith and fair dealing.

For the reasons stated below, PFI's motion for summary judgment is **ALLOWED** and Piantes' motion is **DENIED.**

## II. FACTS

### A. The Consignment Agreements

PFI is a well-known producer of baked goods, which it sells in retail food stores throughout the United States. In order to deliver its products, PFI employs a force of independent contractors, to whom it grants geographically exclusive franchises.

On or about June 3, 1968, Piantes and PFI entered into a written "consignment agreement", under which PFI granted Piantes the franchise to deliver PFI products in certain suburbs of Boston. Under the terms of the agreement, Piantes was to receive PFI products on consignment, and was to sell them on a commission basis to chain-stores, at prices set by PFI. He also was permitted to make additional sales to non-chain stores at prices and profit margins which he could negotiate with the individual retailers.

Piantes paid PFI $7,000 for the franchise, of which $2,000 was his own savings, and $5,000 was borrowed from PFI.[1] In addition, he borrowed $2,600 to purchase a used delivery truck.

The consignment agreement gave both PFI and Piantes the right to terminate their franchise relationship. Piantes could terminate by selling all or part of the franchise to a new franchisee (with PFI's approval), or by providing PFI with 30 days notice of his intent to terminate. PFI could terminate the franchise in the event that Piantes violated one of a list of enumerated "for cause" provisions, and it could also terminate the agreement for no reason at all, provided that it paid Piantes 125% of the fair market value of the franchise, as determined by a panel of arbitrators.

Piantes continued as a PFI franchisee for the next 24 years, developing his territory into one of the highest volume PFI franchises in the country. On four occasions during that period, in 1974, 1976, 1977 and 1978, Piantes and PFI agreed to modify the terms of the franchise—by adding new products to be delivered and/or by splitting off part of the territory to another franchisee. In each instance, Piantes and PFI entered into a new consignment agreement with substantially the same language as the prior ones.

### B. The Route Restructuring Dispute

In the fall of 1992, PFI was contemplating introducing a new "Crunchy Snacks" product line to retail stores in Massachusetts, and anticipated that this would result in a significant increase in the amount of product which each of its franchisees would be delivering. PFI determined that Piantes' route was already operating at or above its capacity, and so decided to ask him to agree to sell off a portion of his route ("a route split").

On November 23, 1992, PFI's Area Sales Manager, Wayne Eriksen, asked Piantes to attend a meeting at which route splitting would be discussed. Piantes told Eriksen that he was not interested in a route split at that time, and refused to attend the meeting.

On December 3, 1992, James D'Avolio, PFI's Manager of Retail Distribution told Piantes that PFI was committed to restructuring its routes and sought his cooperation.

---

1. PFI was selling the route on behalf of the estate of its former owner, who had died.

Piantes once again stated that he would not split off any of his route. D'Avolio told Piantes that if he did not agree to split off part of his route, PFI would exercise its rights under the consignment agreement to terminate his distributorship.

On or about January 1, 1993, Piantes spoke with Ralph DeVito, PFI's Vice President of Sales. DeVito reiterated that if Piantes did not agree to split off and sell a portion of his route, PFI would "take him out" without cause.

On or about January 12, 1993, PFI's Regional Sales Manager, Robert Crider, called Piantes. He explained to Piantes why PFI wanted to restructure his route, and asked him once again to consider splitting off part of his route. Piantes once again refused.

On January 23, 1993, Crider, D'Avolio and Eriksen confronted Piantes at the Star Market in Wellesley during a delivery, and told him that they had termination papers in hand. They offered him one last chance to agree to a route split off. Piantes said he would consider it only after they allowed him to deliver the new "Crispy Snacks" product line for a year. At this point, they handed Piantes written notice that his franchise had been terminated, effective that same day.

PFI subsequently offered to pay Piantes the sum of $226,221.50, which it claims to be 125% of the value of his route, in order to settle his claim under the termination clause. Piantes has apparently refused to accept this payment, and has also refused to invoke the contractual arbitration procedure to determine the amount to which he is entitled.

### C. *PFI's Oral Representation*

Piantes acknowledges that all of the consignment agreements he executed with PFI contained clauses permitting PFI to terminate his franchise upon payment to him of 125% of its fair market value. He contends, however, that these provisions were made inoperative by certain statements made by James Carhoff, who was PFI's District Sales Manager at the time Piantes executed the first consignment agreement in 1968.

According to Piantes, he had been interested in entering a franchise agreement with PFI because his brother was already a PFI franchisee on Cape Cod and had recommended the company to him. Accordingly, between February and May, 1968, Piantes completed a franchise application and credit forms, and submitted them to PFI. In May, 1968, Carhoff informed Piantes that his application had been approved.

Piantes then met Carhoff at the PFI depot in Belmont. Carhoff showed him the consignment agreement, reviewing and explaining each of its terms. Piantes read the agreement and, he says, objected to the termination without cause provision described above. He asked why he should buy a franchise if PFI could terminate it without cause. Piantes says that Carhoff told him that "the only way this [clause] would be executed is if the company decided to go in-house, pull out of the area or distribute the product themselves, which they wouldn't do because it was too costly." Piantes never asked to have this statement put in writing, nor did he ask for an opportunity to review the contract with a lawyer. Rather he signed the contract as it was written.

Although Piantes subsequently signed four revised consignment agreements, Piantes never inquired again about the status of the termination clause. According to Piantes, however, he was told at the time of each signing that, except for certain specified changes, the term and conditions of each new agreement did not represent a change from previous agreements. Piantes also states that he was reassured that his route would not be terminated because DeVito once told him that it was too expensive for PFI to "go in-house" and that PFI was "not in the business of running routes."

### III. *SUMMARY JUDGMENT STANDARD*

A motion for summary judgment will be granted when all the relevant pleadings, viewed in the light most favorable to the nonmoving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco*

Co., 896 F.2d 5, 8 (1st Cir.1990); *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990). Where the defendant moves for summary judgment, it bears an initial burden of pointing out the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the plaintiff to demonstrate that there is evidence sufficient to support his claims at trial. *Id.* at 322, 106 S.Ct. at 2552.

## IV. ANALYSIS

Counts I and II of the Complaint seek a declaration that the termination without cause provision of the consignment agreement is unenforceable against Piantes, and an injunction prohibiting such enforcement. Count III seeks damages under M.G.L. ch. 93A. All three counts rely on the same legal contentions, namely that a) PFI intentionally and fraudulently misrepresented its intentions with respect to the termination without cause provision, b) PFI is estopped from enforcing the provision, and c) that the provision is unconscionable. Accordingly, I will address each of these contentions in turn.

### A. Misrepresentation

■ To recover for misrepresentation or fraud under Massachusetts law, a plaintiff must prove that "the defendant made a false representation of material fact with knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon that statement to his or her detriment." *Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221, 226 (D.Mass.1990). Ordinarily, false statements that concern matters of opinion, conditions to exist in the future, or matters promissory in nature are not actionable. *Yerid v. Mason,* 341 Mass. 527, 530, 170 N.E.2d 718 (1960); *Gerli v. G.K. Hall & Co.,* 851 F.2d 452, 456 (1st Cir.1988). An exception is that "statements of present intention as to future conduct may be the basis for a fraud action if . . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." *McEvoy Travel Bureau,*

Inc. v. Norton Co., 408 Mass. 704, 709, 563 N.E.2d 188 (1990).

■ In my view, Carhoff's statements, upon which Piantes claims to have relied, clearly fall in the category of non-actionable opinion. Piantes alleges that he asked Carhoff why he should enter into a franchise agreement that could be terminated without cause. In response, Carhoff allegedly said that the agreement would only be terminated in certain circumstances, namely in the event that PFI pulled out of the region, or chose to service the route in-house. Carhoff then opined that this would never happen, as the region was profitable and in-house service was too expensive.

Nothing Carhoff said could reasonably be interpreted as an absolute promise never to terminate the franchise agreement. Carhoff never said that the termination clause was inoperative, or did not mean what it said. Rather he suggested, in response to Piantes' expression of concern, that given the economics of the situation, he thought that the termination clause would never be exercised. This is not fraud, but persuasive salesmanship. As it turns out, Carhoff's prediction proved to be accurate for almost 25 years.

Moreover, even if Carhoff's statements can be understood as a promise, they are still not actionable unless Piantes' reliance on them was reasonable (*Trifiro v. New York Life Insurance Co.,* 845 F.2d 30, 33 (1st Cir.1988)) and unless there is evidence that PFI intended to breach that promise at the time it was made. *McEvoy,* 408 Mass. at 709, 563 N.E.2d 188. There is no such evidence here. Turning first to the question of PFI's intent, the evidence is that PFI and Piantes entered into a business relationship which lasted 24 years, mutually beneficial to both sides, and that PFI's intent to terminate the agreement was engendered entirely by Piantes' refusal to split off part of his route in 1992. There is absolutely no indication that in 1968, when the arrangement was entered into, PFI contemplated terminating its arrangement with Piantes, at all, let alone for other than the reasons suggested by Carhoff.

Neither was Piantes' reliance on Carhoff's statements reasonable under the circumstances. When one party to a contract

makes nearly contemporaneous conflicting oral and written representations, it is unreasonable as a matter of law for the other party to rely upon either statement. Rather, the party has a duty to inquire further, and obtain assurances or clarification before relying. *Trifiro*, 845 F.2d at 33. "He does not gamble with the law of the excluded middle, he suspends judgment until further evidence is obtained." *Id.* at 33–34. Here, Piantes, faced with a written contract which clearly contradicted his alleged understanding of oral representation made by PFI's representative a short time before, blithely signed the written version, without having made any attempt to obtain a definitive understanding of its termination provisions.

The facts in this case are easily distinguishable from those in *McEvoy*, upon which Piantes heavily relies. In *McEvoy*, the defendant, Norton, a large corporation, entered into an oral agreement with McEvoy, a small travel agency, whereby McEvoy was to become Norton's exclusive travel agent for the Worcester area. The parties, who had had a non-exclusive business relationship for many decades, agreed that this would be a "long-term" arrangement. Relying on this understanding, McEvoy entered into a five year lease in Norton's office building, and, at considerable expense, hired extra personnel and purchased additional equipment necessary to handle the anticipated business. 408 Mass. at 707, 563 N.E.2d 188.

After the agreement was in force for two months, Norton presented McEvoy with a written version of the contract which it asked McEvoy to sign. McEvoy objected that the contract provided that it could be terminated by Norton on 60 days notice, and that it was renewable yearly. In the language of *Trifiro*, he plainly inquired further and sought assurances and clarification before relying. *Trifiro*, 845 F.2d at 33. Norton responded that the termination clause was "inoperative" and "meaningless" and was a mere technicality to satisfy Norton's lawyers. Based on these categorical assurances and the extensive negotiations which had preceded them, as well as their long standing relationship of trust, McEvoy signed the agreement.

As it turned out, a change in tax laws had made Norton's arrangement with McEvoy less economically attractive, and, at the very time these representations were being made, Norton was actively considering alternatives to using McEvoy as its exclusive agent. 408 Mass. at 708–709, 563 N.E.2d 188. Three years later, it invoked the termination clause it had earlier described as "inoperative", and replaced McEvoy as its agent. These facts which the Court held supported a fraud claim against Norton are distinguishable from the case at bar—the assurances the plaintiff sought and obtained, the relationship of trust the defendant abused to make the plaintiff rely and the defendant's fraudulent intent.

In effect, the situation in *McEvoy* can accurately be described as one in which the defendant, having entered into an oral contract not to its liking, intentionally misled— that is, lied to—the plaintiff in order to induce the plaintiff to sign a written contract contradicting the oral agreement, a contract which provided defendant with a means of relieving itself of its original obligation. Norton, in essence, tricked McEvoy, taking unfair advantage of the relationship of trust which Norton had acquired in their 25 years of earlier business dealings relationship.

By contrast, the contract Piantes was asked to sign did not contradict any earlier agreement with PFI, nor was it presented to him with any illicit purpose. Piantes had had no prior dealings or negotiations with PFI. He was presented with a standard form contract the terms of which he did not like, and after perfunctory inquiry, was assured (accurately, as it turned out), that the offending term was unlikely to be invoked. The holding in *McEvoy* is thus entirely consistent with my conclusion that Piantes' alleged reliance is simply not reasonable as a matter of law, and cannot serve as the basis for a misrepresentation claim. *Trifiro*, 845 F.2d at 33. *See also Turner v. Johnson & Johnson*, 809 F.2d 90 (1st Cir.1986); *Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F.Supp. 920, 924–925 (D.Mass.1993); *Plumer v. Luce*, 310 Mass. 789, 39 N.E.2d 961 (1942); *McCartin v. Westlake*, 36 Mass. App.Ct. 221, 630 N.E.2d 283 (1994).

## B. *Promissory Estoppel*

■ Piantes contends that even if Carhoff's statements were not fraudulent, they constituted a promise which PFI is now estopped from disavowing. A claim for promissory estoppel [2] is established by showing that the promisor made a promise upon which the promisee reasonably relied to his detriment, and where injustice can be avoided only by enforcement of the promise. *Loranger Construction Corp. v. E.F. Hauserman Co.*, 6 Mass.App.Ct. 152, 154, 374 N.E.2d 306 (1978) *aff'd* 376 Mass. 757, 384 N.E.2d 176 (1978). *See also Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 442, n. 13, 597 N.E.2d 1017 (1992) (quoting with approval similar formulation in Restatement (Second) of Contracts 90(1) (1981)).

■ For the reasons I have stated above, I find that Carhoff's statements to Piantes constituted an expression of opinion, and not a promise to Piantes, and that his reliance upon those statements, in the face of a contradictory written contract, was unreasonable as a matter of law. Moreover, I find that even if Carhoff's statements were a promise upon which Piantes reasonably relied, enforcement of the promise is not necessary to prevent injustice against Piantes.

There is no question that Piantes has benefitted tremendously from his purported reliance on Carhoff's statements. For the past 25 years, been able to use the route to earn a living and provide for his family. Moreover, after investing only $2,000 of his own savings, Piantes obtained a route franchise for which PFI is now willing to pay him in excess of $225,000, which amount he can submit to arbitration if he wishes. Nothing in the record suggests that PFI's monetary offer was not made in good faith. Thus, there is no evidence that Piantes will suffer any inequitable loss from PFI's failure to enforce Carhoff's supposed promise. In short, there is no injustice to be remedied because Piantes has not suffered a loss which cannot be remedied under the terms of the contract, terms which PFI appears willing to observe.[3]

## C. *Unconscionability*

■ As a final reason not to enforce the termination without cause provision of the consignment agreement, Piantes contends that the clause is unconscionable. Under Massachusetts law, unconscionability "must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party and not to allocation of risk because of superior bargaining power." *Waters v. Min Ltd.*, 412 Mass. 64, 68, 587 N.E.2d 231 (1992); *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 292–293, 408 N.E.2d 1370 (1980); Restatement (Second) of Contracts § 208 (1981), Comment b. (adding that traditional rule was that a contract was unconscionable if it was "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other").

■ The Supreme Judicial Court has recognized both procedural and substantive aspects of the unconscionability doctrine. A contract may be procedurally unconscionable

---

2. Massachusetts courts use the term "reliance". *See Loranger Construction Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 760–761, 384 N.E.2d 176 (1978).

3. Compare the injustice which was remedied in the following cases: *Cellucci v. Sun Oil Co.*, 2 Mass.App.Ct. 722, 728–729, 320 N.E.2d 919 (1974) *aff'd* 368 Mass. 811, 331 N.E.2d 813 (1975) (after promise by defendant to buy land, plaintiff broke off negotiations with competing buyer, and obtained permits required by defendant, defendant then refused to close the sale, leaving plaintiff in worse financial position); *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 759–760, 384 N.E.2d 176 (1978) (after plaintiff submitted low construction bid calculated in reliance on promise by defendant to serve as plaintiff's subcontractor at a specific price, plaintiff was forced to use different subcontractor at a higher cost); *Greenstein v. Flatley*, 19 Mass.App.Ct. 351, 357, 474 N.E.2d 1130 (1985) (plaintiffs, who prepared to move to new office space in reliance on defendant landlords promise of a lease, were forced to find a new space on short notice, and at a much higher rent); *Palandjian v. Pahlavi*, 614 F.Supp. 1569, 1571–1573, 1581–1582 (D.Mass.1985) *aff'd* 808 F.2d 1513 (1986) *cert. den.* 481 U.S. 1037, 107 S.Ct. 1974, 95 L.Ed.2d 814 (1987) (defendant, member of Iranian Royal family, entered into oral agreement with plaintiff to develop resort in Iran, then used position of influence to deprive plaintiff of all rights in the venture).

if it is the product of "unfair surprise". *Zapatha,* 381 Mass. at 293–294, 408 N.E.2d 1370. For example, consent to the term may have been obtained through high pressure sales tactics. *Waters,* 412 Mass. at 68, 587 N.E.2d 231. The contract may also be substantively unfair if its terms are "oppressive", (*Zapatha,* 381 Mass. at 294–295, 408 N.E.2d 1370), such as if there is a "gross disparity of consideration." *Waters,* 412 Mass. at 68, 587 N.E.2d 231. In essence, "if the sum total of the provisions drive too hard a bargain, a court of conscience will not assist its enforcement." *Waters,* 412 Mass. at 68, 587 N.E.2d 231. The issue of unconscionability is one of law for the court, and the test is to be made as of the time the contract was made. *Waters,* 412 Mass. at 67, n. 3, 587 N.E.2d 231; *Zapatha,* 381 Mass. at 291, 408 N.E.2d 1370.

The *Zapatha* case is particularly instructive, since it also concerns a challenged franchise termination clause. In *Zapatha,* the plaintiffs were owners of a convenience store franchise. Under the terms of the franchise agreement, the defendant franchisor agreed to license its trademark, and provide the plaintiffs with confidential merchandizing methods. It also agreed to furnish the store, and to pay its utility bills and certain other operating expenses. In exchange, the plaintiffs agreed to pay for the initial cost of stocking and staffing the store, and to pay the defendant a percentage of their sales as a franchise fee. After one year, the agreement was terminable without cause by either party on 90 days notice. In the event that the defendant terminated, it was obliged to buy back all of the plaintiffs' inventory at 80% of retail prices.

The *Zapatha* Court rejected the plaintiffs' claim that the termination clause was unconscionable. The court first noted that termination without cause provisions are not per se unconscionable under Massachusetts law. 381 Mass. at 293, 408 N.E.2d 1370. *Compare Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598, 602 (1973) *cert. den.* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974) (finding such terminations against public policy under New Jersey law). With respect to procedural fairness, the Court found that the plaintiffs

had not been subject "unfair surprise" by the inclusion of the contested termination clause. The Court noted that the clause was "neither obscurely worded, nor buried in fine print in the contract" and that it had been specifically pointed out to the plaintiffs at the time of signing. 381 Mass. at 294, 408 N.E.2d 1370. The Court also found that the plaintiffs had had more than adequate time to consider the term before they signed it, especially in light of the fact that they signed subsequent agreements, identical to the first. *Id.* at 294 & n. 14, 408 N.E.2d 1370.

Turning to the substance of the agreement, the Court found the termination clause was not oppressive. Analyzing the relative benefits for each party to the agreement, the Court observed that in exchange for their initial investment, the plaintiffs were able to take over a going business, using equipment provided by defendants. More importantly, there was "no potential for forfeiture or loss of investment" nor was there a question of a "reasonable time to recoup the franchisees initial investment", since the plaintiffs were entitled to net profits during their ownership of the franchise, and a guaranteed buyback of their invested inventory upon termination. *Id.* at 294–295, 408 N.E.2d 1370.

■ Although Piantes' agreement with PFI differs in numerous superficial details from the one at issue in *Zapatha,* I find that, in terms of its economic fairness, it does not differ in any meaningful aspect and is, if anything, less oppressive. As to the question of surprise, there is no evidence to suggest that Piantes was not aware of the clause in question. Indeed, the clause had been in force for 24 years, and Piantes has signed five different versions of the agreement containing it. By his own admission, Piantes complained about the clause at the time he originally executed the agreement. Thus there can be no question that he was aware of it.

As for the substance of the agreement, I find nothing in it which constitutes a gross disparity of consideration, or an otherwise unfair provision. The consignment agreement and PFI's financing of it required Piantes to invest a relatively small sum ($2,000 in cash), in exchange for receiving the exclu-

sive rights to distribute PFI products in a given geographical area. Since Piantes was not required to purchase inventory, this payment, plus his purchase of a truck, were his only financial investments in the business. While the agreement permitted immediate termination without cause upon written notice, it required PFI to pay the plaintiff 125% of the value of the route upon termination. Thus, Piantes was guaranteed that if PFI decided to terminate his route, he would receive the full value of his investment, plus a 25% penalty for the inconvenience.

By contrast, the *Zapatha* franchise agreement, while requiring more advance notice of termination to the franchisee, was less generous financially. Although it did not require a payment to the franchisor to become a franchisee, it did provide that the franchisee was to make an equivalent investment in initial inventory. When the termination clause was invoked, the franchisor was required to pay only 80% of the retail value of the inventory, and needed pay nothing for the goodwill value of the franchise itself.

The PFI agreement is not only fair in theory, but in practice as well, as is amply demonstrated by the very facts of this case. Piantes began his business in 1968 for a total cash investment of approximately $2,000, and a total financial exposure of $10,000, including the financed cost of the franchise and the cost of his truck. Apparently through his own hard work, he built up the route to be one of the most successful in the country, so successful that PFI admits that it is now worth almost $200,000, or about twenty times what Piantes paid for it. Under the terms of a *Zapatha* type franchise agreement, PFI would be liable to Piantes for no more than the value of his inventory, and perhaps his trucks.[4] Instead, PFI has offered to pay Piantes in excess of $225,000, an amount representing 125% of the actual value of his route. Far from there being any "potential for forfeiture or loss of [Piantes'] investment", (*Zapatha*, 381 Mass. at 295, 408 N.E.2d 1370), Piantes received far greater

contractual protections for his business than did the *Zapatha* plaintiffs.

Finally, it is true that, unlike the *Zapatha* agreement, the agreement here requires no advance warning of termination. This, however, is of only theoretical concern. The undisputed evidence shows that Piantes received numerous oral warnings from PFI management that his intransigence would lead to termination, and was well aware of PFI's intentions in this regard. The warnings began on December 3, 1992, 50 days prior to the actual termination. In any event, any disadvantage to Piantes from this short-notice termination provision is more than offset by the 25% premium over fair market value which PFI is required to pay to terminate the agreement.

In sum, Piantes has "failed to sustain [his] burden of showing that the agreement allocated the risks and benefits connected with termination in an unreasonably disproportionate way and that the termination provision was not reasonably related to the legitimate commercial needs of [PFI]." *Zapatha*, 381 Mass. at 295, 408 N.E.2d 1370.

**D. *Leave to Amend (Good Faith and Fair Dealing)***

Piantes has filed a motion for leave to amend the complaint to add a fourth count, for breach of the implied covenant of good faith and fair dealing. PFI opposes this motion on the grounds that it is untimely and prejudicial.

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 59 (1st Cir.1990). Accordingly, a district court abuses its discretion in refusing such leave unless it provides sufficient justification. *Id.* One appropriate justification for refusing leave to amend is where the proposed amendment "would be futile or would serve no legitimate purpose." *Id.* Such is the case here.

Massachusetts law implies in every contract a covenant of good faith and fair

---

**4.** Piantes claims to have invested $27,000 over the course of 24 years to purchase three new

delivery trucks.

dealing between the parties. *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471–472, 583 N.E.2d 806 (1991). It requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* Where one party has the right to exercise discretion under the contract, it is bad faith to use that discretion to "recapture opportunities foregone on contracting as determined by the other party's reasonable expectations." *Id.* at 473, 583 N.E.2d 806. When the claim of bad faith or unfairness involves a contract termination, Court should look "at the consequences of the termination" to determine if it resulted in a "depriv[ation] of earnings, loss of good will, or loss of investment," and if the plaintiff was subject to unfair dealing. *Gram v. Liberty Mutual Insurance Co.,* 384 Mass. 659, 667, 429 N.E.2d 21 (1981). A mere finding that there was no "good" reason for the termination in the absence of other indicia of lack of honesty or taking unfair advantage; or bad faith, is insufficient to support a claim. *Id.* at 671, 429 N.E.2d 21. In a word, the absence of good cause is not the equivalent of absence of good faith. 384 Mass. at 666, 429 N.E.2d 21.

■ Piantes recites a laundry list of allegations against PFI which he claims demonstrates that PFI acted in an unfair manner to deprive Piantes of the benefits of the consignment agreement. Piantes alleges, for example, that he spent 24 years building up the route for PFI's advantage, and that PFI terminated his agreement because of personal animosity, or a desire for personal gain, on the part of PFI's managers. None of these (or his other) allegations, however, supports Piantes' burden of showing that PFI's actions were motivated by a desire to destroy or injure Piantes' right to receive the fruits of the consignment agreement. *Anthony's Pier Four,* 411 Mass. at 471–472, 583 N.E.2d 806.

The consignment agreement provided Piantes with two primary benefits. One was the exclusive right, while the franchise agreement was in effect, to deliver PFI products to retailers in the franchise area and to earn commissions on those deliveries. In the event, however, that PFI chose to terminate its relationship with him, Piantes was entitled to compensation, in the form of 125% of the fair market value of the route. Thus, Piantes had no absolute right to his route under the contract, he only had a right to the route, or to the contractually determined amount of compensation. There is absolutely no evidence to suggest that PFI, in bad faith or otherwise, attempted to deprive Piantes of this disjunctive right. Rather, the undisputed evidence suggests that PFI, having made a business decision to restructure its routes, became exasperated with Piantes' refusal to cooperate in this endeavor, and chose to exercise its option to terminate its relationship with him. They fully intended to, and in fact did, offer to pay Piantes the compensation that to which he was entitled under the agreement.

It is irrelevant that, as Piantes alleges, certain of PFI's lower level managers may have been motivated to terminate Piantes franchise by a desire to increase their bonuses or to improve their apparent performance by meeting internal quotas. What is missing from Piantes' case is any evidence that their actions were motivated by a desire to deprive Piantes of what he reasonably could have expected to receive under the contract, namely continued work on his route, or the contractually determined compensation which he was offered.

The covenant of good faith and fair dealing is often raised in cases involving franchise disputes, as the franchise relationship provides ample opportunity for a large corporate franchisor to take unfair advantage of a small franchisee who is dependent on the franchisor for its business. Typically, the franchisee will allege that the franchisor is unfairly competing with the franchisee, or is undermining the franchisee's ability to reasonably exploit the economic value of the franchise for which he contracted. *See Dunfee v. Baskin–Robbins, Inc.,* 221 Mont. 447, 720 P.2d 1148, 1153–1154 (1986) (franchisor refused to permit franchisee to move store to new shopping mall); *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 817–820 (D.Minn.1989) (franchisor competed with franchisee through supermarket sales); *Mike Naughton Ford, Inc. v.*

*Ford Motor Co.,* 862 F.Supp. 264 (D.Colo. 1994) (franchisor authorized new franchisee to compete with plaintiff's franchise); *B.P.G. Autoland Jeep–Eagle, Inc. v. Chrysler Credit Corp.,* 785 F.Supp. 222 (D.Mass.1991) (withdrawal of credit by franchisor); *Devery Implement Co. v. J.I. Case Company,* 944 F.2d 724, 729–730 (10th Cir.1991) (termination of dealership); *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.,* 146 Wis.2d 568, 431 N.W.2d 721, 725 (App.1988) (opening competing store); *Hubbard Chevrolet Co. v. General Motors Corp.,* 682 F.Supp. 873, 876–877 (S.D.Miss.1987) *aff'd* 873 F.2d 873 (1989) *cert. den.* 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989) (refusal to allow relocation); *Traumann v. Southland Corp.,* 858 F.Supp. 979 (N.D.Cal.1994) (refusal to grant franchise after training); *Richter v. Dairy Queen of Southern Arizona, Inc.,* 131 Ariz. 595, 643 P.2d 508 (App.1982) (refusal of franchisor to consent to assignment of franchise); *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736, 741–743 (1978) (termination of franchise without compensation); *AAMCO Transmissions, Inc. v. Harris,* 759 F.Supp. 1141, 1147 (failure to properly train franchisee and to inform franchisee that franchisor was under legal investigation). *Cf. Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977) (employer terminated salesman with aim of depriving him of commissions already earned but not yet accrued).

In every case, the crux of the claim is that the franchisor has reduced or destroyed the value of plaintiff's investment in the franchise. *See Dunfee,* 720 P.2d at 1153–1154 (ice cream franchisee was forced to remain in area with little pedestrian traffic after opening of large indoor mall); *Carlock,* 719 F.Supp. at 817–820 (increased competition from off-the-shelf sales reduced value of franchise); *Mike Naughton Ford,* 862 F.Supp. 264 (same); *B.P.G. Autoland Jeep–Eagle, Inc. v. Chrysler Credit Corp.,* 785 F.Supp. 222 (withdrawal of credit threatened to destroy franchisee's business); *Devery Implement Co. v. J.I. Case Company,* 944 F.2d at 729–730 (termination of dealership without compensation); *Super Valu Stores, Inc. v. D–Mart Food Stores, Inc.,* 431 N.W.2d at 725 (increased competition); *Hubbard Chevrolet Co. v. General Motors Corp.,*

682 F.Supp. at 876–877 (refusal to allow relocation to more advantageous area); *Traumann v. Southland Corp.,* 858 F.Supp. 979 (plaintiff denied franchise was unable to benefit from franchisee training he obtained); *Richter v. Dairy Queen of Southern Arizona, Inc.,* 131 Ariz. 595, 643 P.2d 508 (refusal of franchisor to consent to assignment made franchisee unable to recoup investment); *Atlantic Richfield Co. v. Razumic,* 390 A.2d at 741–743 (termination of franchise deprived franchisee of the value of good will which he had accumulated over years); *AAMCO,* 759 F.Supp. at 1147 (failure to properly train franchisee and to inform franchisee that franchisor was under legal investigation reduced value of franchise).

Even where some loss of value is shown, courts have been unwilling to intercede where the contract terms give the defendant a clear right to act as it did and where there is no evidence of fraud, deceit or misrepresentation. *See, e.g. Zapatha,* 381 Mass. at 295–296, 408 N.E.2d 1370; *A. John Cohen Insurance Agency v. Middlesex Insurance Co.,* 8 Mass.App.Ct. 178, 392 N.E.2d 862 (1979); *Devery,* 944 F.2d at 729; *Super Valu Stores,* 431 N.W.2d at 726; *Mike Naughton Ford,* 862 F.Supp. at 272; *Carlock,* 719 F.Supp. at 817–820. By contrast, in those cases where the plaintiff has prevailed, the evidence has suggested that the defendant was in essence motivated by a desire to capitalize on the plaintiff's business opportunities under the franchise agreement by constructively or pretextually terminating the franchise agreement without compensation. *See, e.g. Traumann,* 858 F.Supp. at 983–984 (defendant refused to offer plaintiff a franchise after plaintiff underwent franchisee training because defendant could make more profit if it could buy the franchise which plaintiff contemplated purchasing); *Atlantic Richfield,* 390 A.2d at 377 (defendant's termination of franchise was attempt to reap benefits of plaintiff's goodwill without compensating him for it); *Dunfee,* 221 Mont. at 456–457, 720 P.2d 1148 (defendant misled plaintiff into thinking that long-term lease prevented moving franchised store to more profitable location, presumably to allow defendant to capitalize on that opportunity).

Unlike the franchise agreements at issue in the cases described above, Piantes' agreement with PFI specifically contemplates the possibility of a unilateral termination by the franchisor, and specifically provides a contractual remedy, namely monetary compensation as determined by an arbitrator. This contractual remedy makes it virtually impossible for PFI to take the kind of unfair advantage of Piantes which other franchisees have suffered, since PFI is obliged to pay Piantes in excess of the economic value of what he is losing.

In sum, the evidence supports neither Piantes' claim that PFI's termination was motivated by bad faith, or that it deprived him of the fruits of his agreement. Accordingly, I find that Piantes' motion to amend the complaint to add a claim of breach of the covenant of good faith and fair dealing is futile, and therefore should be **DENIED**.

## V. *CONCLUSION*

For the foregoing reasons, defendant's motion for summary judgement is **ALLOWED** and plaintiff's motion to amend the complaint is **DENIED**. This action is, accordingly, dismissed.

**SO ORDERED.**