**John R. KIELY**

v.

**RAYTHEON COMPANY.**

**Civil Action No. 95–10529.**

United States District Court, D. Massachusetts.

Feb. 7, 1996.

---

William F. Green, Cambridge, MA, George E. Brankey, Boston, MA, for Plaintiff.

James F. Kavanaugh, Jr., Conn, Kavanaugh, Rosenthal & Peisch, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION

O'TOOLE, District Judge.

In this suit, the plaintiff John R. Kiely claims that the defendant Raytheon Company broke its promises to him, first, when it forced him to retire prematurely because he was the target of a federal investigation into the improper use of classified documents from the United States Department of Defense, and second, when Raytheon itself pled guilty to a federal offense pursuant to a plea agreement that granted the company immunity from further prosecution, without giving Kiely advance notice that it intended to do so. For these breaches of promise, Kiely

seeks compensatory damages. He also alleges that Raytheon is liable to him for damages caused by its tortious conduct in several respects. Kiely's amended complaint contains five counts, alleging claims of promissory estoppel (Count I), negligent misrepresentation (Count II), intentional interference with business relations (Count III), defamation (Count IV), and breach of contract (Count V).[1]

Raytheon has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, the motion is GRANTED.

The amended complaint[2] alleges the following facts:

In 1967, after his retirement from the Air Force, Kiely went to work for Raytheon as manager of marketing intelligence for Raytheon's Missile Systems Division. (Amended Complaint at ¶¶ 8–9.) Among his principal tasks in that position were the duties to "[e]stablish and maintain rapport with marketing data sources ..." and to "[m]aintain cognizance of available DOD [Department of Defense] budget information especially in the areas of prime concern to the division." (Id., Ex. 2, "Job Description.")

The Department of Defense from time to time provided contractors such as Raytheon with information to be used by them in bidding for defense contracts. Some of the information provided, including budget information, was classified by the Defense Department as "Secret." As manager of marketing intelligence, Kiely received "both receipted and unreceipted classified budget documents" from the government. (Id. at ¶ 13.) The information was highly useful to Raytheon, and "Raytheon's corporate culture was extremely dependent upon this DOD data." (Id. at ¶ 16.)

In March 1985, Kiely read about a federal investigation of the supposed practice among government contractors of trading in "unreceipted classified DOD budgetary documents." Kiely notified "various managers" at Raytheon that he "would no longer participate" in the practice, and thereafter he did not. (Id. at ¶ 17.)

Around the beginning of September, 1989, the United States Department of Justice notified Raytheon that "it and Kiely were being investigated relative to the practice of receiving and disseminating unreceipted classified DOD documents." (Id. at ¶ 18.) Raytheon's general counsel, acting on behalf of the company, then made an agreement with Kiely to work together in defending against potential criminal charges. (Id. at ¶ 19.) Raytheon intended thereby to "induce Kiely to forego exercising his right to plea bargain" if he were to be indicted and to control Kiely's disclosure of information to the government in the course of the investigation. (Id. at ¶ 21.) Raytheon hired and paid for a lawyer to represent Kiely. (Id. at ¶ 22.) When it made the joint defense agreement with Kiely, Raytheon had no intention of performing the promises it made. (Id. at ¶ 23.)

By encouraging Kiely to violate Department of Defense security laws and regulations, Raytheon also "implicitly" promised him that he could engage in the practice of receiving unreceipted classified documents as manager of marketing intelligence without the prospect of adverse employment action being taken against him. Contrary to this implicit promise, on which he relied to his detriment, Raytheon coerced him into accepting early retirement as of January 2, 1990. (Id. at ¶¶ 43–44.)

1. The original complaint, as filed in the Massachusetts Superior Court, purported to set forth what it characterized as five causes of action in eleven counts. The "Fourth Cause of Action" alleged violation of Kiely's rights under various provisions of the United State Constitution, expressed in four separately pleaded counts, numbered VI through IX. On the basis of these claims alleged to arise under federal law, the defendant removed the case to this Court. 28 U.S.C. § 1441(b). Subsequently, Kiely amended his complaint to its present form. The amended complaint contains no federal claims. Nonetheless, the case having been properly removed, the Court retains jurisdiction over the remaining state law claims. 28 U.S.C. § 1441(c); *Commonwealth of Mass. v. V & M Management, Inc.*, 929 F.2d 830, 834–35 (1st Cir.1991); *Ching v. MITRE Corp.*, 921 F.2d 11, 12 (1st Cir.1990).

2. The present form of the complaint is the Amended Complaint bearing the date April 12, 1995. (Docket Entry # 29.)

Raytheon failed to keep the promises it made to Kiely about a joint defense by secretly negotiating a plea agreement with the government. As a result of the plea agreement, Raytheon pled guilty to an information on March 20, 1990, in the United States District Court for the Eastern District of Virginia. (*Id.* at ¶¶ 28–30.) Neither Kiely nor his lawyer knew of the plea before it was entered. (*Id.* at ¶ 31.)

In a memorandum to the professional staff in his office, Raytheon's general counsel falsely said that the guilty plea was "the result of conduct by one former employee" who had "acted contrary to Raytheon policy and without the knowledge of Raytheon management." (*Id.* at ¶ 34; Ex. 3.) Although it was an internal memorandum, the substance of it was published in press reports, naming Kiely as the former employee. (*Id.*, Ex. 10.) This report defamed Kiely. (*Id.* at ¶ 38.)

On March 21, 1990, the day after Raytheon's plea, Kiely was indicted for conspiracy to defraud the government by transferring classified Defense Department documents without authority. (*Id.* at ¶ 33.) Although the fact is not expressly pleaded in the complaint, it is undisputed that Kiely was subsequently convicted of the crime of conspiracy, and his conviction was affirmed on appeal. *United States v. Caso,* 935 F.2d 1288 (4th Cir.1991).

## DISCUSSION

### 1. The Tort Claims

No extended discussion is required to sustain the motion to dismiss the three counts of the Amended Complaint alleging common law torts (Counts II, III, and IV). Each of these causes of action was asserted too late under the applicable statute of limitations. That statute is Mass.Gen.Laws ch. 260, § 2A in the case of the claims of negligent misrepresentation (Count II) and intentional interference with business relations (Count III), and *id.* at § 4, in the case of the claim of defamation (Count IV). As to each of the counts, the applicable statute prescribes that suit be commenced within three years of the accrual of the cause of action. This action was commenced in the state court on Decem-

ber 1, 1994. To have been timely, the tort causes of action must then have accrued not earlier than December 1, 1991. But they all did.

According to the Amended Complaint, the misrepresentations that Kiely complains of in Count II were made over the course of his employment (¶ 48) and particularly in September, 1989 (¶¶ 19–21). By his own allegations, Kiely discovered the falsity of the misrepresentations, and was injured by them, when Raytheon forced him to retire in January, 1990, and when Raytheon abandoned the promised joint defense and pled guilty in March, 1990. At the latest, then, the misrepresentation claim should have been brought within three years of the latter date, or by March, 1993.

In Count III, Kiely alleges that "[d]uring the period of September, 1989 to March 20, 1990" (¶ 54) Raytheon tortiously interfered with his "highly satisfying and favorable business relationship with Raytheon" (¶ 52). As a consequence, "Kiely was not only coerced into early retirement on January 2, 1990, but also was debarred from working with classified documents, and his reputation was defamed irreparably" (¶ 55). Thus, according to his own allegation, the period of tortious interference ended March 20, 1990. Moreover, the debarment referred to was the suspension of Kiely's ability to participate in contracting with the government. Attached to the Amended Complaint as Exhibit 11 is a letter from the Air Force dated December 17, 1990, notifying Kiely of his debarment for a three-year period beginning April 13, 1990. Even if that date marks the accrual of his claim, his assertion of it did not come until more than three years later.

Likewise, his claim for defamation arises out of the memorandum of Raytheon's general counsel in which he blamed Raytheon's guilty plea on Kiely. That memorandum was dated March 21, 1990 (Amended Complaint, Ex. 3), and was publicized as well that day (*Id.*, Ex. 10). The defamation claim, therefore, accrued by March 21, 1990, and it was not timely asserted.

Thus, apart from whatever other defects may exist in the tort claims, it is clear that,

even if they were wholly meritorious, they are barred by the statute of limitations and must be dismissed.

## 2. *Promissory Estoppel*

In Count I of the Amended Complaint, Kiely alleges that by requesting him to engage in the illegal practice of obtaining classified DOD budget documents, Raytheon implicitly promised him that he could commit these acts without fear of suspension or termination (or, as happened in this case, forced early retirement). Kiely says he relied on Raytheon's implicit promise to his detriment and that Raytheon is therefore estopped from denying the promise's enforceability.

Massachusetts law recognizes that a promisee's reliance on a promise may suffice as a substitute for consideration to bring about the formation of a binding and enforceable contract. *Rhode Island Hosp. Trust Nat'l Bank v. Varadian,* 419 Mass. 841, 647 N.E.2d 1174, 1178–79 (1995); *Cambridgeport Sav. Bank v. Boersner,* 413 Mass. 432, 597 N.E.2d 1017, 1023–24 (1992); *Loranger Constr. Corp. v. E.F. Hauserman Co.,* 376 Mass. 757, 384 N.E.2d 176, 179 (1978). "[A]n action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." *Rhode Island Hosp. Trust Nat'l Bank,* 647 N.E.2d at 1179.

An essential element in the pleading and proof of a contract claim is, of course, the "promise" sought to be enforced. In the case of a contract formed by reliance, the putative promise must not only be definite and certain in its terms, *see Santoni v. FDIC,* 677 F.2d 174, 179 (1st Cir.1982), but also must be one that the promisor, expecting to be legally bound by it, intends as a firm commitment. *Rhode Island Hosp. Trust Nat'l Bank,* 647 N.E.2d at 1179. It may not be simply an expression of present intention, *id.,* or a statement that merely gives rise to a hope or expectation on the part of the promisee. *See Cambridgeport Sav. Bank,* 597 N.E.2d at 1024; *see also Congregation Kadimah Toras–Moshe v. De-Leo,* 405 Mass. 365, 540 N.E.2d 691, 693 (1989).

This requirement is strictly policed by the Massachusetts courts in cases where the claim is that the promise relied on was for permanent or lifetime employment. *O'Brien v. Analog Devices, Inc.,* 34 Mass.App.Ct. 905, 606 N.E.2d 937, 939 (1993); *Rydman v. Dennison Mfg. Co.,* 373 Mass. 855, 366 N.E.2d 763, 764 (1977).

Kiely's pleading falls far short in asserting a promise of indefinite or permanent employment that could have been made into a binding contract by his reliance on it. He has failed to plead a promise that was "definite and certain." *Santoni,* 677 F.2d at 179. Indeed, he has not alleged an explicit promise at all; his claim is that Raytheon "implicitly" agreed to keep him employed. Under the cases, a promise that was only "implicit" was not one that could be made into a contract by Kiely's reliance on it. *See, e.g., Rydman,* 366 N.E.2d at 764.

In addition, even if the Amended Complaint could be read to allege a specific promise by Raytheon, the resulting "contract" between Kiely and Raytheon was an agreement to achieve mutual benefit from their cooperative violation of the law. Generally, the Massachusetts courts will decline to enforce a contract the performance of which entails illegal conduct. *Green v. Richmond,* 369 Mass. 47, 337 N.E.2d 691, 695 (1975); *Tocci v. Lembo,* 325 Mass. 707, 92 N.E.2d 254, 255 (1950). The rationale is not hard to grasp: enforcing the illegal bargain would either interfere with the accomplishment of important public policies or it would reward or forgive their transgression. It is true that the courts will overlook illegalities that are only minor or "incidental" and will be careful as well to avoid working a greater injustice that might result in particular circumstances from refusing to enforce the contract on the ground of illegality—such as where one party would suffer an undeserved forfeiture or another would gain a "gross or undeserved ... windfall." *Town Planning & Eng'g Assocs. v. Amesbury Specialty Co.,* 369 Mass. 737, 342 N.E.2d 706, 711 (1976). On the other hand, the refusal to enforce a contract on the grounds of illegality may be fully justified if " 'the characteristics which

gave the plaintiff's act its value to the defendant [were] the same as those which made it a violation ... of law.' " *Id.* (quoting Gardner, *An Inquiry into the Principles of the Law of Contracts,* 46 Harv.L.Rev. 1, 37 (1932)).

That is the case as Kiely sets it forth. The illegal conduct in the performance of the contract was the trafficking in classified Defense Department documents. According to Kiely's own description of the arrangement, it was his willingness to participate in that practice that gave Raytheon value, in exchange for which Raytheon gave its "implicit" assurance that his employment would not be terminated. The illegality was hardly incidental to the contract; it was at its base. Such a contract, if it existed, should not be enforced.

### 3. *Breach of Contract*

 In Count V of the Amended Complaint, Kiely asserts that Raytheon breached their "joint defense" agreement. That agreement arose, he alleges, when Raytheon's general counsel, "and various other of its officers, entered into an oral agreement ... with Kiely, fiduciary in nature, where each party placed trust and confidence in the other and promised mutually to support and defend each other with respect to any and all claims by the U.S. government" concerning the classified documents investigation. (Amended Complaint at ¶ 64.) Raytheon violated the agreement, according to Kiely, by secretly negotiating a plea agreement for itself with the government and by placing all the blame for criminal behavior on Kiely alone. (*Id.* at ¶ 65.) As a consequence of the breach, Kiely suffered debarment from government contracting, while Raytheon preserved its ability to continue profitable defense contracting. (*Id.* at ¶ 70.)

In his brief opposing the present motion, Kiely has explained his claim.[3] Under the joint defense agreement, he says, Raytheon had a duty to inform him that it intended to enter plea negotiations and to disclose to him the "substance of information it intended to reveal to the [Department of Justice]." (Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, fifteenth unnumbered page.) If Raytheon had not breached the agreement, Kiely "would have been able to timely plea bargain in his own behalf and ... rebut the factual misrepresentations being made by Raytheon to [the Department of Justice]." (*Id.* at fifteenth unnumbered page.)

If the terms of the joint defense agreement are what is set out in the October 25 letter—as the brief suggests—the acts Kiely complains of would not have amounted to a breach. The letter contains no agreement by Raytheon not to plead guilty, not to provide information to the government independently from Kiely, or not to do either without telling Kiely first. Those supposed promises simply do not exist in the letter. Rather, the letter sets forth an agreement to preserve as confidential, and perhaps privileged, information that might be shared between Kiely and Raytheon as two potential defendants in the prospective prosecutions that might emerge from the ongoing investigation. Kiely's theory reads more into the letter than is expressed there.

If the October 25 letter is not a complete expression of the joint defense agreement but rather simply concrete evidence of a more general, oral agreement (as the current Amended Complaint would have it), Kiely has failed to set forth a viable breach of contract claim, for at least two reasons: First, performance of the contract in accordance with the promises alleged would have interfered with a federal criminal investigation and would therefore have been contrary to public policy, if not actually illegal. Second, Raytheon's breach caused Kiely no legal

---

3. In his brief, Kiely points to a letter agreement between his lawyer and Raytheon, dated October 25, 1989, as setting forth the terms of the joint defense agreement. After the defendant's motion to dismiss was filed, Kiely moved to amend his complaint a fourth time, the substance of the amendment being to assert that the defense agreement was embodied in that letter, rather than in an oral agreement, as the Amended Complaint alleged. The motion to amend further has been denied as futile because, for the reasons set forth in the text, it does not matter whether the agreement was in the specific terms set forth in the letter or in the more general terms pleaded in the existing form of the complaint.

harm for which compensatory redress is available.

An agreement by Kiely and Raytheon not to talk to the government without the other's consent would have given either a potential veto over the other's furnishing relevant, truthful information to investigators of criminal activity. Such a veto would obviously interfere with the investigation and might even in some circumstances amount to a criminal obstruction of justice. At the very least, it would present a sufficiently substantial impediment to the achievement of a desired public good that a contract arranging for such a veto power ought not to be sanctioned by enforcement.

Furthermore, even if Raytheon breached an enforceable promise by making its own deal with the government without giving Kiely advance notice, the breach did not cause Kiely the kind of specific, demonstrable harm for which a remedy can be given. The harm he says he suffered was to be deprived of the opportunity to strike his own bargain with the prosecutors. It is hard to see the possible causal connection between Raytheon's act of pleading guilty and any loss of an opportunity for Kiely to reach his own plea agreement with prosecutors, if that was what he wanted to do. There is no reason to suppose generally that it was only possible for either Raytheon or Kiely, but not both, to plead guilty, so that by acting contrary to its promise, Raytheon seized for itself the only available plea opportunity. If there were any particular circumstances that might have made that so, it was up to Kiely to allege them, but he has not done so. For example, he does not allege that he had a specific opportunity for a favorable plea agreement that Raytheon's plea interfered with. He alleges only that he *might* have been able to make a favorable deal if Raytheon either had not acted alone or if it had at least told him in advance what it intended to do.[4] These allegations are simply too speculative and contingent to support an award of damages.

Proof that reasonably specific damages were caused by the defendant's breach is essential to a contract claim. The defendant is entitled to a dismissal of the claim if the plaintiff fails to make out that proof. *Puritan Medical Ctr., Inc. v. Cashman,* 413 Mass. 167, 596 N.E.2d 1004, 1013 (1992); *Lufkin's Real Estate, Inc. v. Aseph,* 349 Mass. 343, 208 N.E.2d 209, 211 (1965); *Snelling & Snelling of Mass., Inc. v. Wall,* 345 Mass. 634, 189 N.E.2d 231, 232 (1963). Here, Kiely has failed even to allege the necessary specific harm that he suffered as a consequence of Raytheon's surprise plea agreement with the government. As a consequence, Kiely has not set forth a breach of contract claim upon which relief can be granted, and Raytheon's motion to dismiss Count V should be allowed.

## CONCLUSION

For the foregoing reasons, Raytheon's motion to dismiss the Amended Complaint for failure to state a claim is GRANTED. The action is DISMISSED.

SO ORDERED.

---

4. Of course, it was also open to Kiely to plead guilty without the prosecutor's agreement if he desired. *See generally* Fed.R.Crim.P. 11. He did not choose that course, however, and the charges against him were ultimately decided by a jury. The Amended Complaint gives no clue about how Kiely was harmed by being convicted after a jury trial rather than after a plea.