John R. KIELY, Plaintiff, Appellant,

v.

**RAYTHEON COMPANY,**
Defendant, Appellee.

No. 96–1430.

United States Court of Appeals,
First Circuit.

Jan. 28, 1997.

William F. Green, Boston, MA, with whom Robert A. Rossi, Stoughton, MA, Law Office of William F. Green, George E. Brankey, were on brief, Boston, MA, for appellant.

James F. Kavanaugh, Jr. with whom Christine G. Messer and Conn, Kavanaugh, Rosenthal, Peisch & Ford, L.L.P. were on brief, Boston, MA, for appellee.

Before TORRUELLA, Chief Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge,

PER CURIAM.

This is an appeal from a dismissal of two contract claims. *See* Fed.R.Civ.P. 12(b)(6). Plaintiff John R. Kiely ("Kiely") was employed by defendant Raytheon Company ("Raytheon") from 1967 to 1990. Part of Kiely's job was to obtain classified Department of Defense ("DOD") documents. Some of those documents were released by DOD to representatives of defense contractors like Raytheon, and some were not officially released. The receipt of the latter documents is a federal crime, and both Kiely and Raytheon have been convicted thereof. Those convictions are not at issue here.

Raytheon's sentence required the corporation to pay fines and damages of $1,000,000. It was not precluded from entering into government contracts. Kiely was sentenced to two years imprisonment, with all but six months, which were to be served in a halfway house, suspended. He was debarred from working on government contracts for a period of three years.

Kiely sued Raytheon, asserting five claims. Three tort claims were dismissed on statute of limitations grounds and have not been appealed to this court. Kiely's other two claims sounded in contract: promissory estoppel relating to Kiely's "forced" retirement, and breach of a mutual defense agreement that was allegedly made when Kiely and Raytheon learned that they were targets of a federal criminal investigation. The district court granted Raytheon's motion to dismiss both claims. We now affirm.

On appeal, we "review[ ] the granting of a motion to dismiss *de novo,* applying the same criteria that obtained in the court below." *Garita Hotel Ltd. v. Ponce Fed. Bank,* 958 F.2d 15, 17 (1st Cir.1992). We must accept the complaint's allegations as true, indulging all reasonable inferences in favor of Kiely. *Id.* Dismissal is proper only if it is clear that no relief could be granted, under any theory, "under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Vartanian v. Monsanto Co.,* 14 F.3d 697, 700 (1st Cir.1994).

## I. *Promissory Estoppel*

Kiely's promissory estoppel claim is that Raytheon, "by requesting Kiely to commit acts in violation of the DOD security laws (receiving unreceipted classified ... documents) over the course of Kiely's employment from 1967 through 1985, [was] implicitly promising Kiely that he could commit these acts without being coerced at some future time into taking early retirement" or suffering other employment-related detriment. Am. Compl. ¶ 43. Kiely alleges that he "relied on this promise to his detriment, as Raytheon in fact did coerce him into tak-

ing early retirement effective January 2, 1990." Kiely asserts that "Raytheon is, therefore, estopped from denying the unenforceability [sic] of this promise which it made to him." *Id.*, ¶¶ 45–46.

This claim fails. The applicable Massachusetts law recognizes that a promisee's reasonable and detrimental reliance on a promise may serve as a substitute for consideration and render the promise "enforceable pursuant to a traditional contract theory," but only if the promisee can prove "all the necessary elements of a contract other than consideration." *Rhode Island Hosp. Trust Nat. Bank v. Varadian,* 419 Mass. 841, 647 N.E.2d 1174, 1178–79 (1995) (quotation omitted).

The district court held that Kiely failed to state a valid promissory estoppel claim. First, the court found that Kiely failed to meet the first requirement for a promissory estoppel cause of action, namely, that a binding promise be made. *Id.; Santoni v. FDIC,* 677 F.2d 174, 179 (1st Cir.1982). The court agreed with Raytheon that the company's alleged promise was not definite, certain, or explicit enough to bind the company to any specific actions. *Santoni,* 677 F.2d at 179. Raytheon asserts, in particular, that the promise alleged by Kiely in this case does not carry, even implicitly, manifestations of an intent to be bound, so that it would be binding under a contract theory, *i.e.,* so that it would "justify a promisee in understanding that a commitment had been made." *Rhode Island Hosp.,* 647 N.E.2d at 1179 (quoting Restatement (Second) of Contracts § 2 (1981)). Raytheon also avers that it was unreasonable for Kiely to rely on such a vague, implicit promise, so he fails to meet the reasonable reliance requirement for a promissory estoppel claim. *See* Restatement (Second) of Contracts, § 90(1) & cmt. b; *cf. United States v. Maling,* 988 F.2d 242, 245 (1st Cir.1993) (estoppel in criminal sentencing). The district court also agreed with Raytheon that the alleged agreement was to

violate the law, which is unenforceable as against public policy. *See Green v. Richmond,* 369 Mass. 47, 337 N.E.2d 691, 695 (1975).

 We reach a different conclusion than the district court did as to its first ground for dismissal. Under the applicable standard of review, we must accept as established that Raytheon hired Kiely and requested him to perform certain tasks as part of his job, including receiving unreceipted classified documents. Based upon such factual allegations, it seems to us sufficiently "definite and certain" that Raytheon was implicitly promising that it would not terminate or discipline Kiely for following his superiors' orders.[1] The key is the parties' understanding and intent: were they merely engaged in preliminary negotiations, with details to be worked out later, or did their minds meet on a firm commitment? Here, it appears closer to a firm commitment. There was nothing left to negotiate; the parties were not engaged in mere "inchoate negotiations" that failed to rise to the level of a commitment to be bound, from which Kiely could reasonably develop no more than a "well-founded hope" that he could perform his job functions without fear of reprisals. *See Hall v. Horizon House Microwave, Inc.,* 24 Mass.App.Ct. 84, 506 N.E.2d 178, 184 (1987). An "explicit" statement to that effect is not necessary to create a contract. An employee may reasonably rely on an employer's instructions to perform certain tasks as including an implicit promise that he can perform those tasks without fear of being fired solely because he performed them.

 On the other hand, we agree with the district court that the alleged contract was an agreement to achieve mutual benefit from the parties' cooperative violation of the law. Such a contract, even if explicitly agreed to by both parties, is void and unenforceable as against public policy.[2] *See*

---

1. Kiely is not claiming a contractual right to lifetime employment, as Raytheon misstates his position. Rather, Kiely appears to claim that, while Raytheon can fire him without stating any reason at all, if Raytheon does state a reason, it cannot be an improper one. And Kiely asserts that it is improper to fire him solely for following

Raytheon's instructions to co-conspire with the company in the commission of a crime.

2. Kiely relies on the Restatement to render this rule inapplicable. If an agreement contains an illegal provision that is not central to the agree-

*Green,* 337 N.E.2d at 695. "[C]ourts will not lend their aid to relieve parties from the results of their own illegal adventures." *Tocci v. Lembo,* 325 Mass. 707, 92 N.E.2d 254, 256 (1950). It would have been unreasonable for Kiely to rely on such an illegal contract. *Cf. American Viking Contractors, Inc. v. Scribner Equip. Co.,* 745 F.2d 1365, 1372 (11th Cir.1984) (promise which is unenforceable cannot be reasonably relied upon). We reject Kiely's contention that it was reasonable to commit a crime in reliance on an implicit promise that he would not be fired for doing so.

## II. *Breach of Contract*

Kiely's breach of contract claim alleges that Raytheon "entered into an oral agreement" with Kiely, "fiduciary in nature, where each party placed trust and confidence in the other and promised mutually to support and defend each other with respect to any and all claims by the [United States] Government" in its investigation of unlawful use of documents. Am. Compl. ¶ 64. The complaint does not mention any written agreement.[3] It alleges that Raytheon "undertook a clandestine course of action against Kiely in breach

of these promises" (without any further specification of which "promises" were broken), "whereby it sought to exculpate itself and its officers and directors from any actionable wrongdoing or debarment from bidding on government contracts, by falsely and in bad faith stating to DOJ officers and by falsely and in bad faith giving oath before a U.S. District Judge that Kiely acted alone and contrary to Raytheon policy, and without the knowledge of Raytheon management in knowingly obtaining and conveying secret DOD [documents]." *Id.* at ¶ 65. The complaint adds that Raytheon's "clandestine campaign" in breach of its promises "culminated" in its plea agreement, "without Kiely's knowledge or participation," in which plea Raytheon "falsely and in bad faith blamed the entire matter on Kiely."[4] *Id.* at ¶ 66.

This breach of contract claim has no more merit than the promissory estoppel claim. The district court dismissed the breach of contract claim for three reasons: the alleged contract is unenforceable because it is contrary to public policy; Kiely has not alleged any harm for which redress is available; and there is no causal connection between Ray-

---

ment and the illegal provision does not involve serious moral turpitude, the illegal portion of the agreement is discarded, and the balance of the agreement is enforceable. *See* Restatement (Second) of Contracts, § 184. In the instant case, however, the illegal conduct is not minor or incidental, which might remove it from the rule forbidding enforcement of contracts that are against public policy. *See Green,* 337 N.E.2d at 695. The very essence of the contract alleged in Kiely's own complaint is that Raytheon asked him to commit acts in violation of national security laws. Indeed, this is the only reason why Kiely claims to be in a position different from any at-will employee, who would be terminable for any reason or for no reason. He claims that his employment cannot be interfered with solely on account of his involvement in this illegal activity. As a result, ironically, he is claiming that his employment status, which would otherwise be at-will, was strengthened because he engaged in criminal acts (or that his employer's management prerogatives were diminished because the company joined with its employee in committing such acts). This is more an equitable estoppel claim—that the employer is estopped from exercising its normal management prerogatives because it conspired with its employee to commit criminal acts—than a promissory estoppel contract-based claim. But the only claims before us are the contract claims.

3. Kiely moved to amend his complaint again to add a reference to a written mutual defense agreement of which he claims he had been unaware at the time he drafted his initial complaint. He asserts that he only recently learned about this written agreement when his prior lawyer (on the criminal case) provided him a copy. The inconsistencies between the oral and written agreements need not detain us here, nor should any implications (such as credibility questions noted by Raytheon) which might flow from the series of events as recounted by Kiely.

4. Kiely also alleged that Raytheon breached its agreement by sending to its own professional staff a memorandum stating that the criminal charge to which Raytheon had pled guilty was the result of one former employee's conduct. *Id.* at ¶ 69. We cannot understand how this memorandum—sent after entry of the plea agreement—could conceivably constitute a breach of the alleged agreement to mutually defend against government claims, especially where those claims had already been concluded as to Raytheon. The agreement cannot be deemed to survive Raytheon's entry of a separate plea agreement and Kiely's learning of that plea agreement.

theon's alleged conduct and Kiely's claimed harm.

■ In accepting Raytheon's public policy argument, the district court misinterprets Kiely's claim. As worded by Raytheon in its brief, "in essence plaintiff's allegation is that the agreement prohibited Raytheon from providing information to the government or conducting plea negotiations without his knowledge or participation." Defendant's Brief at 35–36. Having set up this straw man, Raytheon knocks it down by asserting that such an agreement cannot be enforced because it would violate public policy by restricting parties from negotiating with the government and discouraging parties from providing true information to the government and from entering into plea agreements, all of which are favored by public policy.

Kiely, however, does not assert that the mutual defense agreement should be understood to preclude those worthy goals. He claims only that the agreement (1) precluded Raytheon from making *false* statements about Kiely and (2) required Raytheon to *notify* him that the mutual defense agreement was terminated so he would be aware that Raytheon was pursuing its own defense separately and possibly in conflict with his. Kiely apparently takes the position that, if he had received such notice, he might have taken a different course in his own defense. So framed, Kiely's claim for enforcement of the agreement would not prohibit Raytheon from pursuing its own separate defense or from negotiating a plea bargain. Nor would it restrict Raytheon's ability to provide true information to the government in its criminal investigation. The notice to which Kiely claims he was entitled under the agreement would simply permit Kiely to defend himself most effectively under the changed circumstances. Such a mutual defense agreement is not void as against public policy.

■ On the other hand, we agree with the district court's second reason for dismissing the breach of contract claim: that the damages alleged by Kiely are "not the kind of specific, demonstrable harm for which remedy can be given." A. 294–95. Kiely alleges that Raytheon's breach of contract—through its allegedly false statements and its failure to notify him that it was terminating the mutual defense agreement—caused him to suffer the following harms: (1) he refrained from effectively defending himself; (2) he was denied the opportunity to plea bargain with the government; (3) he was denied the *de facto* immunity granted to other Raytheon employees; (4) he was indicted; and (5) he suffered emotional injuries resulting from the foregoing. Am. Compl. ¶¶ 27, 33, 35, 36, 40. These alleged harms are too speculative to be legally cognizable and redressable. *See Johnson v. Comm'r of Correction,* 36 Conn. App. 695, 652 A.2d 1050, 1057 , *cert. denied,* 233 Conn. 912, 659 A.2d 183 (1995); *cf. Veranda Beach Club v. Western Sur. Co.,* 936 F.2d 1364, 1380–81 (1st Cir.1991) (tort and promissory estoppel claims).

As to the first alleged harm, Kiely had as much legal right as Raytheon did to pursue his own defense separately, whether or not he thought it immoral. Kiely was represented by counsel during the course of the criminal investigation and his trial; indeed, Kiely's attorney was one of the architects of the mutual defense agreement with Raytheon. Presumably, his counsel advised him in some detail as to the advantages and disadvantages, the risks and pitfalls of each possible course of action, including the possibility that his alleged partner in crime, Raytheon, might at some point decide to pursue its own separate interests which might not coincide with Kiely's. In addition, Kiely was no doubt aware, through counsel if not otherwise, that the mutual defense agreement did not deprive the parties of the right to make strategic decisions for themselves regarding their respective defenses, since their interests were similar but not identical. Kiely himself made his own decisions and took his chances, for his own reasons. Kiely has not alleged any ineffectiveness in the assistance he received from counsel, nor any conflict of interest based on the fact that his counsel was chosen and paid by Raytheon.

As for Kiely's second and third alleged harms, Kiely did not have a legal right to a plea bargain or to immunity. Those were within the discretion of the prosecutor, which

this court will not second-guess.[5] *Government of the Virgin Islands v. Scotland,* 614 F.2d 360, 365 (3d Cir.1980). Moreover, Kiely's indictment for a crime of which he was later convicted surely does not rise to the level of a legally cognizable harm. Finally, Kiely's claim that he suffered emotional harm as a result of the first four types of harm is not legally cognizable because the four events underlying the emotional harm are not cognizable.

Kiely's allegations are doubly speculative: that, if Raytheon had not breached their agreement, he might have had some opportunity to plea bargain; and that such a plea might have been more advantageous to him than the sentence he received after trial. The basic assumption underlying Kiely's claim is that he would have received a lesser sentence had he plea bargained rather than exercised his right to go to trial.[6] This assumption is too speculative to be enforceable. *See Bush v. United States,* 765 F.2d 683, 685 (7th Cir.), *cert. denied,* 474 U.S. 1012, 106 S.Ct. 542, 88 L.Ed.2d 472 (1985). After all, Kiely's obtaining unreceipted classified documents constituted a crime, with or without Raytheon's knowledge. If Kiely had thought it helpful, he could have provided information—to the prosecutors after he was indicted, to the jury at trial, or to the court prior to sentencing—contradicting Raytheon's "rogue employee" statements. He has offered no reason to believe that his sentence was enhanced because of Raytheon's alleged statements that Kiely acted *alone* rather than in concert with Raytheon. In short, Kiely has failed to allege that he has suffered cognizable harm as required in order to state a claim upon which relief may be granted.[7]

◼ Moreover, Kiely has not alleged a valid causal connection between Raytheon's breach and the damage he suffered. Raytheon argues that: "To sustain a contract claim based on the allegation of a convicted criminal that someone else, rather than his own conduct, was the proximate cause of his conviction would entirely subvert the policy and societal interests inherent in criminal punishment. Allowing a convicted criminal to receive civil compensation for the harm caused by his conviction would lessen the effect of the punishment determined by the criminal justice system, allow him to profit from his own wrongful acts, and undermine the deterrent and retributive purposes of criminal punishment." Defendant's Brief at 47. We need not address whether Raytheon is estopped from arguing this point, either because it too was convicted for its role in the same crime, or because of the unseemly cynicism of Kiely's partner in crime relying on such a position to escape civil liability. In circumstances such as these, the law presumes that Kiely's conviction was based on his own illegal acts, not on Raytheon's breach of a mutual defense agreement. The breach of contract claim was properly dismissed.

5. It appears to us that Kiely's real complaint is with the prosecutors and the Pentagon for prosecuting him and letting Raytheon off the hook with what Kiely considers to be a slap on the wrist, permitting Raytheon not only to avoid some forms of criminal punishment (incarceration for any of its officers or employees other than Kiely) but also to continue to bid on government contracts. Kiely may be right that he might have been able to arrange a favorable plea bargain with the prosecutors in exchange for his testifying against Raytheon, if the government had wanted to pursue such a course against the "bigger fish." Kiely may also be right that his chances of obtaining such a deal might have been enhanced if he had pursued that course from the outset rather than relying on his "mutual defense agreement" with Raytheon. But it is not the role of this court to second-guess a prosecutor's decision as to which defendant to pursue more vigorously or what sentence to seek in each case. Moreover, having chosen one course of action, Kiely cannot now complain about what might have been if he had made a different choice.

6. We leave aside here the fact that Kiely had the same *legal* right that Raytheon exercised to take independent action that best served his own interests.

7. Thus, while Raytheon's provision of false information to DOJ or the court might subject the company to criminal liability (if the government believes the information was false and exercises its discretion to prosecute), civil liability to third parties like Kiely does not necessarily flow from such conduct. Such liability is not embraced by Kiely's contract claims which are now before us. To the extent that Kiely sought to impose civil liability in his claims of defamation, negligent misrepresentation, and intentional interference with business relations, those causes of action have not been appealed.

In conclusion, it is not for us to say whether Raytheon's treatment of Kiely was immoral or "nasty." Plaintiff's Brief, Addendum at 54. Nor are we presented with the question of whether Kiely might have a legitimate legal claim against anyone not a party to this litigation. All we decide today is that Kiely's claims against Raytheon in this appeal are without merit.

*Affirmed.*