**PREMIER TECHNICAL SALES, INC., Plaintiff,**

v.

**DIGITAL EQUIPMENT CORPORATION, Defendant.**

Civil No. 96–21054 SW.

United States District Court, N.D. California.

May 22, 1998.

John F. Runkel, Jr., Sheppard, Mullin, Richter & Hampton, San Francisco, CA, for Plaintiff.

William Bates, III, McCutchen, Doyle, Brown & Enersen, LLP, San Francisco, CA, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

Plaintiff Premier Technical Sales, Inc. ("Premier") initiated this suit against Defendant Digital Equipment Corporation ("DEC") alleging the following eight causes of action: (1) breach of the covenant of good faith and fair dealing; (2) breach of contract; (3) promissory estoppel; (4) unjust enrichment; (5) fraud; (6) intentional interference with contractual relations; (7) violation of the Massachusetts Consumer Protection Act; and (8) violation of the California Unfair Practices Act.

DEC now seeks summary judgment or in the alternative partial summary adjudication as to each of these causes of action.

### BACKGROUND

Premier provides outside sales representation for companies that manufacture semiconductor chips and other electronics products. DEC is a manufacturer of semiconductor chips and other computer products. On March 1, 1994, Premier and DEC

entered into a written Manufacturer's Representative Agreement ("the Agreement"), granting Premier exclusive rights to solicit orders for a variety of DEC semiconductor products in Northern California and Nevada. The Agreement was initially for a one year term, but included an automatic renewal clause, providing that the Agreement would automatically renew at the end of each one-year period for an additional year, unless one of the parties gave 60 days prior written notice of its intent not to renew. In addition, either party could terminate the Agreement for convenience at any time by giving the other party 60 days prior written notice, or for cause by giving 30 days written notice. If DEC were to exercise its right to terminate for convenience, it would be obligated to pay Premier commissions for sales invoiced during the six months following the date of the termination.

Premier worked as DEC's outside sales representative for two years: from March 1, 1994 until February 29, 1996. Under the terms of the Agreement, commissions were Premier's sole source of compensation. Attachment C of the Agreement set out the commission schedule, which provided for a full commission for sales to a customer within Premier's territory and a partial commission for sales in which only a portion of the transactions leading to the sale occurred within Premier's territory.

Pursuant to the commission schedule, only sales generated commissions. No compensation was forthcoming for any other event, including what is referred to in sales parlance as a "design-win." A design-win (or sometimes "design-in") occurs when a sales representative convinces a customer to incorporate a particular chip into the design of a product. Although convincing a manufacturer to commit to a particular chip may take substantial time and effort on the part of a sales representative, the Agreement only provided for commissions based on actual sales of the chip. Premier sought and obtained a number of design-wins during the course of its representation of DEC.

On December 26, 1995, DEC's Vice President of World Wide Sales Richard Riker ("Riker") provided Premier President Steve Dowdell ("Dowdell") with 60-day notice of DEC's intent not to renew the Agreement for an additional year. The parties agree that DEC paid all of the full commissions and split commissions it owed to Premier for sales made during the two-year Agreement period. The parties also agree that DEC paid Premier all commissions for sales invoiced during the six months following the date of the termination.

DEC contracted with I–Squared, Inc. ("I–Squared") to replace Premier as DEC's outside sales representative effective March 1, 1996. As DEC's outside sales representative, I–Squared serviced all customers previously serviced by Premier, including those from whom Premier had secured design-wins. No customer was served by internal DEC salespeople. DEC paid I–Squared commissions on sales that it would have paid to Premier under the Agreement had Premier continued as DEC's representative.

### LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that a court shall enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion" and must demonstrate that no genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party is not required to *negate* those portions of the nonmoving party's claim on which the nonmoving party bears the burden of proof. *Id.*

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

The adjudication of a summary judgment motion is not a "trial on affidavits." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Credibility determinations and weighing of the evidence are solely jury functions. *Id.* at 255, 106 S.Ct. 2505. Inferences drawn from underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

However, there may be no genuine issue of material fact if "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the nonmoving party. *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505. In some circumstances the factual context may render the nonmoving party's claim implausible, and the nonmoving party must come forward with "more persuasive evidence" to support the claim "than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## DISCUSSION

The Agreement includes a choice of law provision which provides that Massachusetts law shall be used to resolve any disputes under the Agreement. Therefore, Massachusetts law governs the disposition of all Premier's claims except its claim for violation of the California Unfair Practices Act. *See Nedlloyd Lines B.V. v. Superior Court of San Mateo County,* 3 Cal.4th 459, 464–65, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992)(holding choice of law provisions enforceable under California law).

### 1. Breach of the Covenant of Good Faith and Fair Dealing

Premier's first cause of action is for breach of the implied covenant of good faith and fair dealing. Premier argues that DEC violated the implied covenant by the manner in which it enforced the termination provision of the Agreement. Premier contends that DEC demanded that Premier make substantial changes to its business, promising a "long-term relationship" in return. The evidence

submitted by Premier demonstrates that DEC, unsatisfied with the sales representation provided by Premier, asked Premier to take such actions as increasing the number of sales representatives on its sales force, hiring a dedicated distribution sales representative, opening a sales office in Sacramento, and expanding employment benefits for its sales representatives. Premier claims that when DEC promised it a long-term relationship in return for compliance with these demands and then terminated the Agreement after just two years, DEC's enforcement of the "for convenience" termination provision violated the implied covenant of good faith and fair dealing. Premier reasons that it is therefore entitled to recover commissions on any and all sales, whenever occurring, which resulted from the design-wins it achieved while representing DEC.

Massachusetts law implies in every contract a covenant of good faith and fair dealing between the parties. *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471–72, 583 N.E.2d 806 (1991). "Neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* In situations where one party has the right to exercise discretion under the contract, it is bad faith to utilize that discretion to "recapture opportunities foregone on contracting as determined by the other party's reasonable expectations." *Piantes v. Pepperidge Farm, Inc.,* 875 F.Supp. 929, 938 (D.Mass.1995)(quoting *Anthony's,* 411 Mass. at 473, 583 N.E.2d 806).

When the claim of bad faith or unfairness concerns a contract termination, the Court "should look 'at the consequences of the termination' to determine if it resulted in 'a depriv[ation] of earnings, loss of good will, or loss of investment' and if the plaintiff was subject to unfair dealing." *Piantes,* 875 F.Supp. at 938 (quoting *Gram v. Liberty Mutual Insurance Co.,* 384 Mass. 659, 667, 429 N.E.2d 21 (1981)). A mere finding that there existed no good reason for the termination absent any other indicia of lack of honesty or bad faith is insufficient to support a claim. *Id.* "[T]he absence of good cause is

not the equivalent of absence of good faith." *Id.*

Premier's argument that DEC breached the implied covenant of good faith and fair dealing by the manner in which it exercised the termination provision of the Agreement is not persuasive. DEC hired Premier to provide sales representation. It did so because of Premier's experience and expertise as a sales representative in Silicon Valley. The Agreement allowed either party to terminate with 60 days prior written notice to the other party, and provided a commission payment schedule in case of such a termination. The parties recognized the possibility that one of them would be unsatisfied with the contract and explicitly provided a means to facilitate its termination. Employing that means does not constitute bad faith.

That DEC wanted improved representation and suggested to Premier certain ways in which that could be accomplished before exercising its right to terminate likewise does not evidence bad faith. If anything, that DEC attempted to resolve its concerns with Premier before terminating the Agreement demonstrates its good faith. There is no evidence that DEC did anything that had the effect of destroying or injuring Premier's right to receive the fruits of the Agreement.

Premier further argues that its "design-wins" assured DEC of a steady flow of future sales and that Premier is entitled to recover future benefits reflective of its past services. In support of its argument, Premier relies on *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977), and its progeny. Premier's reliance on *Fortune,* however, is misplaced. In *Fortune,* the defendant sought to avoid paying a sales representative a significant portion of a commission by terminating him after an order had been placed but before the sale had been completed. The defendant would have kept that portion of the commission for itself, thus realizing a financial windfall. The court held that the defendant acted in bad faith when it terminated the sales representative in order to deprive him of a commission he had already earned.

In the present action, Premier acknowledges that it has been paid commissions due on all sales made during the two-year Agreement period, as well as the six months following the termination. There is no dispute regarding compliance with the actual terms of the Agreement. Instead, Premier argues that the work it performed securing "design-wins" for DEC entitles it to commissions on sales likely to be placed following termination of the Agreement. That a sales representative's "efforts may have augmented the prospect for future orders does not bring [an action] within the ambit of [*Fortune* ]." *Gerald Rosen Co., Inc. v. International Telephone & Telegraph Co.,* 16 Mass.App.Ct. 929, 450 N.E.2d 189, 190 (1983). "[T]he cases have not extended the concept [of bad faith termination] to cover a generalized expectation of future orders in types, quantities, and sums unknown at the time of termination." *Id.* The commissions Premier seeks are for orders that were uncertain at the time DEC terminated the Agreement. "A rule broad enough to cover this case would revolutionize the whole concept of manufacturers' reps and salesmen, nowhere suggested in the cases." *McNulty v. W.S. Libbey Co.,* Civ. No. 84–3851–MA–A, 1987 WL 9762, *3 (D.Mass. Mar.4, 1987).

In addition, DEC did not realize any financial windfall when it terminated its Agreement with Premier. Commissions on all subsequent sales were paid to I–Squared, not retained by DEC. The Court finds that there is no evidence of bad faith by DEC, and that DEC is entitled to summary judgment on Premier's claim of breach of the implied covenant of good faith and fair dealing.

## 2. Breach of Contract

Premier asserts that the parties agreed to orally modify the written Agreement, but that DEC breached the allegedly modified Agreement when it discharged Premier as its sales representative. Under Massachusetts law, a written contract "may be varied by a subsequent oral agreement based upon a valid consideration." *Cambridgeport Savings Bank v. Boersner,* 413 Mass. 432, 439, 597 N.E.2d 1017 (1992)(quoting *Siegel v. Knott,* 316 Mass. 526, 528, 55 N.E.2d 889 (1944)). DEC argues, however, that oral modification in this instance is barred by

section 22.0 of the Agreement, which provides:

22.0 ENTIRE AGREEMENT:

\* \* \* \* \* \*

Except as provided herein, no modification or addition to the Agreement shall have any effect unless set forth in writing specifically referred to as a modification or addition to this Agreement and signed by both parties hereto.

Under Massachusetts law, however, a contract term that bars any modification except by written instrument does not necessarily bar oral modification of the contract, so long as the evidence of the oral modification is "of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties." *Id.*

■ Premier argues that the parties agreed to modify the Agreement when DEC requested that Premier take such actions as increasing the number of sales representatives on its sales force, hiring a dedicated distribution sales representative, opening a sales office in Sacramento, and expanding employment benefits for its sales representatives. As consideration for this modification, Premier argues that DEC agreed that the parties would have a long-term relationship.

The fact that DEC suggested to Premier how it could better represent DEC's interests cannot be said to be outside the scope of the Agreement. DEC hired Premier to retain the benefit of Premier's sales expertise. Premier's duties and obligations under the Agreement include the following:

9.1 [Premier] shall use its best efforts in the Territory to introduce, promote the Sale of, and obtain orders for Product.... [Premier] shall devote as much time and attention and resources to the conduct of the activities as shall be necessary to properly provide such efforts in the circumstances occurring in the Territory during the term of this Agreement; shall take such other actions as [DEC] advises will be helpful to that end; and shall conduct its activities in accordance with such general instructions as [DEC] may issue from time to time but without [DEC] directing or controlling particulars or actions of [Premier].

When they signed the Agreement, the parties anticipated subsequent communication regarding the adequacy of Premier's representation, and the statements and letters by DEC on that subject do not demonstrate an intent to modify the Agreement. Any work Premier performed on DEC's behalf pursuant to DEC's advice and general instructions does not constitute valid consideration supporting a determination that the parties modified the Agreement.

Even *assuming arguendo* that the work performed by Premier is sufficient to find a modification, DEC's statements about a future relationship are too vague and open-ended to form an enforceable contract. Such terms as "long-term," "long haul" and "long run" are not the type of "definite and certain" terms that courts require "so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." *Lucey v. Hero Int'l Corp.*, 361 Mass. 569, 281 N.E.2d 266, 269 (1972); *see also Whelan v. Intergraph Corp.*, 889 F.Supp. 15, 18 (D.Mass.1995)(statement that employee "could count on a long-term commitment" was "too vague and open-ended" to constitute an offer of lifetime employment); *Steinke v. SunGard Financial Systems, Inc.*, 121 F.3d 763, 773–74 (1st Cir.1997)(finding no oral modification of employment agreement).

The alleged statements of future intent made by DEC are not of sufficient force to overcome the strong presumption that the completely integrated Agreement reflects the true intention of the parties. The Court determines that the parties did not modify the Agreement, and therefore does not reach the issue of the modified terms nor whether DEC breached the Agreement as modified.

**3. Promissory Estoppel**

■ Premier's third cause of action states that because Premier justifiably relied to its detriment on the promises made by DEC, Premier is entitled to recover under the doctrine of promissory estoppel. In Massachusetts, a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such

action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Veranda Beach Club Ltd. Partnership v. Western Surety Co.*, 936 F.2d 1364, 1380 (1st Cir.1991)(citing *McAndrew v. School Committee of Cambridge*, 20 Mass. App. 356, 480 N.E.2d 327 (1985) and quoting *Restatement (Second) of Contracts* § 90(1) (1981)).

 In this case, Premier argues that it relied on DEC's promises of a long-term relationship when it performed work for which it was not compensated. The doctrine of promissory estoppel is typically invoked "when the formal requirements of contract formation are absent and when enforcing the promise would serve the interests of justice." *Steinke*, 121 F.3d at 776. Because the parties' relationship was governed by a valid, enforceable contract providing for compensation for the work performed by Premier, Premier may not bring a cause of action for promissory estoppel.

 Even *assuming arguendo* that no valid, enforceable contract governed the conduct of the parties, however, Premier has failed to establish a key element of this cause of action. "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation" to its detriment. *Rhode Island Hospital Trust National Bank v. Varadian*, 419 Mass. 841, 848, 647 N.E.2d 1174 (1995)(quoting *Pappas Industrial Parks, Inc. v. Psarros*, 24 Mass.App. 596, 599, 511 N.E.2d 621 (1987)). "[T]he putative promise must not only be definite and certain in its terms, but must also be one that the promisor, expecting to be legally bound by it, intends as a firm commitment." *See Kiely v. Raytheon Co.*, 914 F.Supp. 708, 712 (D.Mass. 1996), *aff'd*, 105 F.3d 734 (1st Cir.1997)(internal citations omitted). The promise may not be simply an expression of present intention, nor a statement that merely gives rise to a hope or expectation on the part of the promisee. *See id.*

 Premier has failed to produce evidence that DEC's statements regarding a "long-term" relationship between the parties were unambiguous. Although such statements may have raised the expectations and

hopes of Premier, nothing in the statements suggests a firm commitment by DEC of a new termination date for the allegedly extended contract.

 Furthermore, Premier fails to show that it acted reasonably when it relied on DEC's promissory statements. The evidence shows that Premier recognized that DEC could exercise the termination clause in the Agreement at any time. Premier could not have developed a reasonable expectation that its relationship with DEC would be long-term in the face of an express provision that allowed termination with 60 days prior written notice. Summary judgment in favor of DEC on Premier's promissory estoppel claim is appropriate.

### 4. Unjust Enrichment

 Premier alleges that DEC was unjustly enriched when it did not compensate Premier for work performed before the parties entered into the Agreement, as well as work performed during the two-year Agreement period. However, the equitable remedy afforded by the doctrine of unjust enrichment is not available to a party with an adequate remedy at law. *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F.Supp. 683 (D.Mass.1991). An action for unjust enrichment fails if it is based on a valid, enforceable contract; this remedy is only available where a valid contract does not exist. *Rezendes v. Barrows*, Civ. No. 96–01625, 1997 WL 448194, *1 (Mass.Super. July 31, 1997).

 In this action Premier is not entitled to bring a claim for unjust enrichment because its claim is based on the valid, enforceable Agreement between the parties. Although Premier argues that it aided DEC in setting up a sales and marketing infrastructure before the parties entered into the Agreement, the evidence makes clear that Premier provided this aid without any expectation of compensation. DEC expressed its appreciation, and Premier never asked for anything more. Indeed, Premier believed that any compensation would come only from sales—and corresponding commissions—of DEC products.

Further support for the contention that payment for all work performed prior to the date of the Agreement is governed by the terms of the Agreement can be found in the terms of the Agreement itself:

> This Agreement constitutes the entire understanding between the parties relating to the subject matter hereof, and supersedes all prior writings, negotiations or understandings with respect thereto.

This clause expresses the parties' intention to assimilate all prior understandings into the Agreement and Premier is not entitled to recover on a claim for unjust enrichment.

### 5. Fraud

■ Premier's fifth cause of action alleges that representatives of DEC made certain fraudulent statements to Premier which induced Premier to perform work and expend resources for which it was not compensated. To recover for fraud under Massachusetts law, a plaintiff must prove that: (1) the defendant made a false representation of material fact with knowledge of its falsity; (2) the defendant made the statement for the purpose of inducing the plaintiff to act thereon; and (3) the plaintiff relied upon that statement to his or her detriment. *Piantes*, 875 F.Supp. at 933. However, such statements are only actionable where the recipient's reliance is reasonable. *Id.* (citing *Trifiro v. New York Life Insurance Co.*, 845 F.2d 30, 33 (1st Cir.1988)).

■ Ordinarily, false statements that reflect opinion, conditions to exist in the future, or matters promissory in nature are not actionable. *Id.* (citing *Yerid v. Mason*, 341 Mass. 527, 530, 170 N.E.2d 718 (1960)). An exception to this general rule is that "statements of present intention as to future conduct may be the basis for a fraud action if ... the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." *Id.* (quoting *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 709, 563 N.E.2d 188 (1990)).

■ Premier asserts DEC made fraudulent statements relating to a long-term relationship between the parties. According to Premier, DEC had no intention of maintaining a long-term relationship even while it was telling Premier that it did. Premier argues that DEC made these statements for the purpose of inducing Premier to continue as DEC's outside sales representative. Premier claims that in reliance on DEC's statements, it continued to represent DEC rather than terminate the Agreement.

DEC's statements to Premier regarding a "long-term" relationship are clearly promissory in nature. Therefore, they would not ordinarily be actionable, and to bring a claim for fraud Premier must rely on the exception stated in *McEvoy*. However, Premier has presented no evidence that DEC intended to deceive Premier when it made the statements. Premier's current belief that DEC never had any intention of fulfilling its assurances of a long-term relationship is insufficient to withstand summary judgment. Without evidence that DEC representatives planned not to fulfill the allegedly promissory statements, Premier's arguments regarding a cause of action for fraud under the *McEvoy* exception must fail.

■ Even *assuming arguendo* that Premier provided evidence that DEC representatives made fraudulent statements, Premier cannot show that it acted reasonably in relying on those statements. The evidence shows that the Premier principals knew that the Agreement could be terminated for cause or for convenience at any time with 60 days prior written notice. This knowledge precludes any reasonable reliance on DEC's alleged promises of a "long-term relationship." The Court determines that it was unreasonable as a matter of law to ignore the express terms of the Agreement and instead rely on oral representations that contradicted them. *See Oggiono v. Fabmet Corp.*, Civ. No. 92–12595–Z, 1993 WL 328100, *3 (D.Mass. Aug.2, 1993)(dismissing fraud claim based on statement that agreement would be to plaintiff's "long term financial benefit" because "any expectation of long term benefit was clearly limited by the termination clause within the Agreement"); *Celtic Development Corp. v. F.D.I.C.*, 836 F.Supp. 926 (D.Mass.1993)(reliance on an oral misrepresentation was unreasonable as a matter of law); *dB Sales, Inc. v. Digital Equipment Corp.*, 951 F.Supp. 1322, 1327 (N.D.Ohio 1996), *aff'd*, 125 F.3d 855 (6th Cir.1997)(applying Massachusetts law and holding that it

was unreasonable for plaintiff to believe that it had a three-year term when the contract contained an at-will termination clause); *Health Plans, Inc. v. New York Life Insurance Co.*, 898 F.Supp. 941, 946 (D. Mass 1995)(reliance on oral representation that ran directly contrary to a pre-existing contract was unreasonable as a matter of law); *Piantes*, 875 F.Supp. at 933 (reliance on oral representation is unreasonable as a matter of law where party faces written contract which is clearly contradictory). Accordingly, DEC is entitled to summary judgment on Premier's claim of fraud.

### 6. Intentional Interference with Contractual Relations

Premier's sixth cause of action alleges that DEC intentionally interfered with Premier's contractual relations with third parties when DEC promised a "long-term" relationship if Premier severed its relationship with those third parties. In an action for intentional interference with a contract, the plaintiff must prove that: (1) it had a contract with a third party; (2) the defendant knowingly induced the third party to break the contract; and (3) the plaintiff was harmed by the defendant's actions. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 551 N.E.2d 20 (Mass.1990). Additionally, the defendant's conduct must not only be intentional, but must also be "improper in motive or means, causing harm to the plaintiff." *Draghetti v. Chmielewski*, 416 Mass. 808, 816, 626 N.E.2d 862 (1994).

In this action, although Premier has shown that it had contracts with a number of third parties, it has failed to assert that DEC knowingly induced any of those third parties to break their contracts with Premier. Rather, Premier admits that it broke the contracts itself. That Premier broke its own contracts does not support a cause of action for intentional interference with contractual relations.

### 7. Violation of the Massachusetts Consumer Protection Act

Premier's seventh cause of action alleges that DEC violated the Massachusetts Consumer Protection Act ("CPA") by fraudulently inducing Premier to perform numerous tasks for no compensation and to sacrifice significant portions of its business. The CPA provides, in relevant part, that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *Mass. Gen. Laws* ch. 93A, § 2(a). Chapter 93A further provides that "no action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth." *Mass. Gen. Laws* ch. 93A § 11.

To determine whether an activity occurred primarily and substantially in Massachusetts, courts consider: (1) where the defendant committed the deceptive or unfair acts or practices; (2) where the plaintiff received and acted upon the deceptive or unfair statements; and (3) the situs of the plaintiff's losses due to the unfair or deceptive acts or practices. *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d 1260, 1265–66 (1st Cir.1990); *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985). When evaluating the first of these factors, the defendant's offensive acts should be considered to have occurred not only where they originated, but also where "it was intended that their force and input influence the plaintiff's behavior." *Clinton Hospital*, 907 F.2d at 1265.

The conduct asserted by Premier to violate Chapter 93A did not occur primarily and substantially in Massachusetts. First, the evidence shows that if DEC made certain fraudulent statements, the intention behind them was to induce Premier's behavior in California, not in Massachusetts. Second, Premier clearly received and acted upon those statements in California. Finally, all of Premier's claimed losses occurred in California. Clearly, DEC's conduct occurred primarily and substantially within California, not Massachusetts, and summary judgment on this claim must be entered in favor of DEC.

### 8. Violation of the California Unfair Practices Act

Premier's eighth cause of action is for unfair competition in violation of the

California Unfair Practices Act ("UPA"). The UPA, contained in the California Business and Professions Code § 17200, *et seq.,* codifies California public policy against unfair competition, and "prohibits wrongful business conduct in whatever context such activity might occur." *Stoiber v. Honeychuck,* 101 Cal.App.3d 903, 927, 162 Cal.Rptr. 194 (1980); *see also Committee on Children's Television v. General Foods Corp.,* 35 Cal.3d 197, 209–210, 197 Cal.Rptr. 783, 673 P.2d 660 (1983). Unfair competition is defined broadly as any "unlawful, unfair or fraudulent business act or practice." *Cal. Bus. & Prof.Code* § 17200. An action based on § 17200 to redress an unlawful business practice essentially "borrows" violations of other laws and treats them as independently actionable. *Farmers Insurance Exchange v. Superior Court,* 2 Cal.4th 377, 383, 6 Cal.Rptr.2d 487, 826 P.2d 730 (1992).

Premier argues that DEC's allegedly fraudulent statements constitute an unfair trade practice as defined under § 17200. However, as discussed above, Premier cannot show that DEC's conduct constituted fraud. Since Premier's unfair business practices claim does not allege that DEC engaged in any other unlawful conduct or that DEC's conduct was undertaken for anti-competitive purposes it must also fail. *See Khoury v. Maly's of California, Inc.,* 14 Cal.App.4th 612, 619, 17 Cal.Rptr.2d 708 (1993).

**REQUEST FOR JUDICIAL NOTICE AND MOTIONS TO STRIKE**

When Premier filed its opposition to DEC's motion for summary judgment, it also requested that the Court take judicial notice of a civil complaint filed in Santa Clara County Superior Court in 1992 against, among others, Richard Riker. DEC opposed Premier's request for judicial notice, objected to certain evidence submitted by Premier, and moved to strike that evidence as irrelevant or inadmissible. Following DEC's motion to strike, Premier filed a request for leave to file a motion to strike DEC's opposition and response to DEC's evidentiary objections. DEC opposed Premier's motion to strike.

As the civil action against Richard Riker bears no relevance to the present action, the Court DENIES Premier's request for judicial notice of that action (docket no. 25) and GRANTS DEC's motion to strike as to that request (docket no. 34). The Court DENIES DEC's motion to strike as to the other evidence submitted by Premier. Furthermore, the Court DENIES Premier's request for leave to file its motion to strike DEC's objections to submitted evidence (docket no. 37).

**CONCLUSION**

Premier has failed to establish that there is a genuine issue of material fact regarding any of its eight causes of action, and DEC is entitled to judgment as a matter of law. The Court therefore GRANTS DEC's motion for summary judgment (docket no. 15).

IT IS SO ORDERED.